Filed 2/18/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

JAMES FRANCIS O'MALLEY,

      Defendant and Appellant.

S024046

Santa Clara County
Super. Ct. No. 131339

Defendant James Francis O'Malley was convicted at trial of three counts of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of conspiracy to commit murder (§ 182.1), and one count of robbery (§§ 211, 212.5, subd. (b)). The jury acquitted defendant of a second charge of conspiracy to commit murder. The jury also found true special circumstances alleging murder for financial gain, multiple murder, and robbery murder. (§ 190.2, subd. (a)(1), (3), (17)(A).) Additionally, the jury found true allegations that defendant personally used a firearm and a deadly and dangerous weapon in the commission of the offenses. (former §§ 12022, subd. (b), 12022.5, subd. (a).) Following a penalty trial, the jury returned a verdict of death. The trial court denied the automatic application to

---

[1] All unspecified statutory references are to the Penal Code.

1

modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Summary

In 1986 and 1987, defendant was a member of a Hayward-based motorcycle club called the Freedom Riders, as well as president of its San Jose chapter. The evidence presented at trial showed that the three murders of which defendant was convicted all had some connection to his involvement in the club. The first victim, Sharley Ann German, was married to Geary German, a fellow Freedom Rider, who paid defendant to kill Sharley Ann to prevent her from divorcing him and claiming their marital assets.[2] The second victim, Herbert Parr, was a Freedom Rider "wannabe" whom defendant and Rex Sheffield, another Freedom Rider, killed to obtain Parr's motorcycle. The third victim, Michael Robertson, was a friend of defendant's whom defendant and Sheffield killed because defendant suspected him of being a "snitch." Defendant either admitted the killings or implicated himself in them in statements he made to various people, including one of his girlfriends, Brandi Hohman.

#### 2. Prosecution Case-in-Chief

##### a. The Sharley Ann German Murder

Sharley Ann German was married to Geary German, who, like defendant, was a member of the Freedom Riders. They lived with Thomas M. (Sharley Ann's teenage son), Judith Flemate (a friend of Sharley Ann's), and Flemate's

---

[2]     To avoid confusion, we refer to the victim and her husband by their first names.

2

husband. Defendant and Geary were good friends. In 1985, another Freedom Rider, Rex Sheffield, fatally shot Geary's neighbor Frank Ramos, with whom Geary had had a dispute. The killing occurred in the Germans' garage with a gun belonging to Geary. Sharley Ann told police Sheffield was the shooter and showed them where the gun was concealed. Sheffield was arrested and pled guilty to involuntary manslaughter. Geary was angry that Sharley Ann had snitched on Sheffield and their marriage began to deteriorate.

In April 1986, Sharley Ann confided to her friend Judith Flemate that she wanted to divorce Geary because he was having an affair with a coworker named Sandra Lithgow. Sharley Ann confronted Geary about the affair and also told Lithgow's husband about it. Flemate later heard the couple quarrelling in the garage and when they emerged, Sharley Ann had a black eye and her throat was bruised. A few weeks later, Sharley Ann told Flemate, in Geary's presence, that when she married Geary she had paid off his debts and paid for work on their house, and she would see to it that he lost the house and their bank accounts. Geary was very angry. Sharley Ann also told her friend Joan Whitworth that she wanted to divorce Geary and keep the house, and mentioned that she had a life insurance policy.

Geary was scheduled to return to jail and serve his sentence for his part in the Ramos killing while Judith Flemate and her husband remained with Sharley Ann, who was worried about retaliation from Ramos's family.[3] Geary, however, wanted them to leave, so they moved out a few days before April 25.

---

[3]    Geary, who was charged as an accessory, was sentenced to 10 months in county jail for his involvement in the Ramos killing, but his sentence was stayed until April 30, 1986. After Sharley Ann's murder, he received a further stay to July 30, 1986. He was released from jail on October 14, 1986. At the time of

*(footnote continued on next page)*

3

On the morning of April 25, a Friday, Thomas M. woke up at 6:00 a.m., and talked to Sharley Ann before leaving for school. Geary had already gone to work, clocking in at 6:45 a.m. Daniel Whitworth, Joan's husband, talked briefly to Sharley Ann on the phone around 9:40 a.m., when he called and asked to borrow a battery charger, and again a few minutes later when she called back and asked to borrow a book. She seemed normal and was apparently alone. Her mother also spoke with her briefly by phone around the same time. Thomas returned home from school around 4:00 p.m. The front door was unlocked, which was unusual. He went into his bedroom to change clothes, where he discovered Sharley Ann's body on the floor between the dresser and the bed. He went to the home of Reni Jensen, the next-door neighbor, for help. Jensen called 911.

Sergeants Philip Beltran and Charles Hahn and Officer Herb Brown of the San Jose Police Department were dispatched to the German residence. All were present when Geary appeared around 4:30 or 5:00 p.m., which was later than he usually arrived home on Fridays. According to Officer Brown, Geary showed no emotion upon the discovery of his wife's murder. It appeared to Sergeants Beltran and Hahn that he was pretending to be anguished.

Sharley Ann's autopsy revealed she had been stabbed on the left side of her neck, severing her carotid artery, and shot in the head with a .25-caliber handgun. The medical examiner attributed her death to both wounds.

Geary received the proceeds of Sharley Ann's insurance policy and bought a red Corvette with the license place "CRIKET4." "Cricket" was his pet name for

_____

*(footnote continued from previous page)*

defendant's trial, Geary had not been arrested for or charged with his wife's murder.

4

Sandra Lithgow, whom he continued to see after Sharley Ann's death. Sharley Ann's silver Honda went missing after her death. On July 25, 1986, it was found abandoned just off the Dumbarton Bridge near Interstate 580.

On the day his mother was killed, Thomas M. told police he thought a member of the Ramos family might have killed her because of the ongoing feud between the families in the wake of Frank Ramos's death. Police investigated Ramos's wife, Connie, but Sharley Ann's murder remained unsolved until defendant was arrested in 1988 on other charges.

Following defendant's 1988 arrest, Theodore Grandstedt, with whom defendant sold drugs, told police that Geary had hired defendant to kill his wife. Grandstedt told police he saw defendant the day of the killing. Defendant was excited and agitated and told Grandstedt he had finished doing the job, which Grandstedt understood to mean that he had killed Sharley Ann. Grandstedt said defendant and Geary had a dispute over payments for the killing. He told police that defendant and Karen Dolan (one of defendant's girlfriends, the mother of his children, and eventually his wife) argued about Geary owing money to defendant for his part of the job.

In July 1987, defendant described how he killed Sharley Ann to Robert Fulton, a one-time Freedom Rider. He said he went to her house, talked to her for a while, then went into another room and stabbed her in the neck. After he stabbed her, he shot her. He told Fulton that Sharley Ann "was a tough bitch to kill," and that Geary had hired him to kill Sharley Ann because she was going to divorce Geary and "take everything." Defendant said Geary paid him $2,500 and gave him Sharley Ann's silver Honda, which Fulton had seen in the Germans' driveway before Sharley Ann was killed. Defendant called him when the car broke down on the side of the Dumbarton Bridge and asked Fulton to help him fix or move it. Fulton declined and defendant abandoned the car.

5

Marlene Fulton, Robert Fulton's wife, saw defendant driving Sharley Ann's car after the murder. Defendant subsequently told her he had killed Sharley Ann. She agreed with her husband that defendant showed up at their residence after the car broke down on the Dumbarton Bridge.

According to Brandi Hohman, one of defendant's girlfriends, defendant told her he was hired by Geary to kill Sharley Ann, which he did by shooting her and cutting her throat. Defendant also told Hohman he sold the .25-caliber handgun he had used to a girl he met at the home of their mutual friend, Laurel Beiling. In December 1986, Alison Hurst, who was living with Beiling, bought a .25-caliber semiautomatic handgun from defendant.

At trial, defendant's friend Richard Balthazar testified that around the summer of 1986 he cleaned a gun for defendant, who gave him the box the gun came in. Police obtained the box from Balthazar. Edward Peterson, an expert in firearm identification, testified that the bullet that killed Sharley Ann German had characteristics consistent with a bullet fired from the gun that would have been contained in the box.

### b. *The Christopher Walsh Robbery*

To provide context for subsequent events related to the charged offenses, the prosecution, over defendant's objection, presented evidence that defendant robbed Christopher Walsh. In December 1986, Walsh, who aspired to join the Freedom Riders, was staying with defendant and Hohman at a motel in Mountain View. Walsh and defendant had a falling out after Walsh kicked defendant's dog and Walsh moved out of the motel room. Later, he called defendant and asked if he could return to pick up some of his belongings. Defendant agreed. Walsh returned to the motel and he and defendant used methamphetamine. Defendant then pistol-whipped Walsh and forced him to write a phony bill of sale for his

6

motorcycle, turning it over to defendant. Defendant told Walsh that if he went to the police, defendant would hunt him down and kill him. Walsh nonetheless reported the robbery to the police, and a warrant was issued for defendant's arrest.

### c. The Herbert Parr Murder

According to his girlfriend, Linda Magner, Herbert Parr was a motorcycle club wannabe. In late 1986 or early 1987, Parr met Joseph Martinez, a member of the Freedom Riders, and through Martinez he met defendant, who sold marijuana to Parr. Magner sensed that the two men disliked each other, an impression confirmed by defendant's girlfriend Brandi Hohman, who said that defendant usually used the derogatory term "lop" to describe Parr.

Linda Magner bought Parr a Harley Davidson motorcycle. Parr was proud of the motorcycle and liked showing it off to his Freedom Rider acquaintances, including defendant. On the night of August 14, 1987, Parr told Magner he was going to Joseph Martinez's house and would return in a couple of hours. She never saw him or the motorcycle again. That night, Parr showed up at a party at his brother David's house. A number of Freedom Riders were at the party, including defendant and his friend Rex Sheffield, the man who had killed Frank Ramos. When David went to bed between 1:00 a.m. and 3:00 a.m. that morning, Parr was still at the party.

Defendant was selling drugs at the party. He had earlier told Brandi Hohman he knew Herbert Parr was going to be there and that he wanted Parr's motorcycle. He said he was going to wait for Parr at the party and intimidate him. When defendant and Parr encountered each other, defendant made "mean" comments to Parr, who seemed afraid of defendant. Hohman heard defendant and Rex Sheffield talking about taking Parr's motorcycle for a ride. Sheffield became

7

offended when Parr bragged about knowing a member of the Hells Angels whom Sheffield knew was dead.

Defendant and Parr disappeared into a back room for an hour and when they emerged they acted like buddies. Defendant decided to move the party to the home of his friend Laurel Beiling and invited Parr to come along. Brandi Hohman and defendant left in his car while Parr followed on his motorcycle. On the drive to Beiling's, defendant told Hohman he was going to beat up Parr and take his motorcycle.

There was no party when defendant, Hohman, and Parr arrived at Beiling's residence; everyone there was asleep. Defendant, Hohman, and Parr went into Beiling's bedroom, where they used methamphetamine. Hohman was sent to the store. When she returned, Sheffield and his wife, Gail, had arrived. Defendant, Sheffield, and Parr went into the backyard. Defendant asked Parr if he wanted his last cigarette before they went out. Hohman and Gail Sheffield were told to go to the front of the house. While they waited there, Hohman heard a high pitched voice and strange noises that sounded like gurgling, coming from the backyard. Defendant and Sheffield entered the house without Parr and went into a bathroom. Hohman heard running water and defendant told her he and Sheffield had been washing up. Defendant told Hohman to take Yoshi — a friend of Beiling's staying at her house — to the store in Sheffield's car and keep him there for a while. When they returned, Hohman and defendant went to the motel where they were staying.

The next day, Laurel Beiling went into her backyard and noticed that a pile of wood beside the shed had been "knocked around." Inside the shed she found further disarray. She was rearranging a stack of lumber when she found a bloody board with between 17 and 27 "knife stabs" in it, made by a double-edged blade. She also discovered that a double-edged utility knife she customarily wore on her

8

belt was missing. Beiling tried to call defendant but reached Brandi Hohman, whom she told about the bloody board. When Hohman told defendant about the call, he was angry that Beiling had mentioned the subject over the phone. Later Beiling spoke to defendant, who told her to calm down and come to his house. He apologized for leaving her house "in a mess" and said he would clean it up. He returned her knife, telling her it was clean and she had nothing to worry about. Later that day, defendant went to Beiling's home and together they cleaned up the board and the shed. As they did, defendant told her the less she knew, the better.

A day or so later, defendant brought a U-Haul truck to the motel at which he and Brandi Hohman were staying. With him was Freedom Rider Steven Dyson. Accompanied by Hohman, defendant drove the truck to a house in Fremont because, he told her, "[t]hey had to tear down [Parr's] bike." Defendant said another Freedom Rider was going to buy the dismantled motorcycle from Sheffield and defendant. Hohman did not see Parr's motorcycle in the back of the truck because defendant told her to remain in the cab, but she heard and felt a heavy object being lifted and removed from the back. Defendant and the men who were assisting him went into the garage and closed the door. Eventually, defendant and Hohman returned to their motel.

Sometime after Laurel Beiling's call, defendant told Brandi Hohman he had killed Parr in Beiling's backyard. He said he stabbed Parr, then cut his throat and "step[ped] on him trying to push the blood" out of his body "because he wasn't dying." Defendant acted out the killing for her. Defendant gave Beiling various versions of Parr's death but in the most specific and detailed account he said he had killed Parr.

Not long after the Fremont trip, defendant, still driving the U-Haul truck, took Hohman to the house in San Jose defendant sometimes shared with Karen Dolan and their children. It was there, he said, that he intended to "bury [Parr]."

9

At the house, defendant directed Hohman to the garage. She saw Steven Dyson digging a hole in back of the garage. Defendant helped with the digging. When he and Dyson finished, Dyson backed defendant's car — a white Cadillac — up to the hole and opened the trunk. He and defendant removed Parr's body, lowered it into the hole, and buried it. Later, defendant asked Laurel Beiling and his friend Michael Robertson to buy baking soda and apples to put in his trunk to remove the smell of Parr's body.

After defendant's arrest, police recovered Parr's body from behind the garage of the San Jose residence. A search of defendant's car revealed baking soda and dried apples in the trunk.

At trial, the pathologist who performed the autopsy on Parr's body testified he had died after receiving 18 stab wounds.

### d. The Michael Robertson Murder

Defendant was arrested for the Christopher Walsh robbery on April 18, 1987. A bail bondsman posted his bail on April 20; the bail was secured by certificates of title to cars and motorcycles belonging to members of the Freedom Riders. Defendant was scheduled to appear in court on October 7, but failed to do so. Bail was forfeited and an arrest warrant issued. According to Laurel Beiling, one of the Freedom Riders who put up vehicles as security for defendant's bail was "pissed" by defendant's failure to appear. Around the same time in early October, defendant got into an accident while riding a motorcycle belonging to Freedom Rider Joseph Martinez. Defendant hid the motorcycle at Beiling's house and told her not to let Martinez know about the accident until he could repair the damage to the vehicle. Martinez was very angry when he learned about the accident.

10

As a result of these incidents, defendant began avoiding direct contact with his fellow Freedom Riders and communicated with them through his close friend Michael Robertson. Robertson and defendant were together almost every day and Robertson sometimes shared a motel room with defendant and Brandi Hohman. At some point, however, defendant began to suspect Robertson of being a snitch. Defendant told Hohman that Robertson, who had recently been released from jail, must have made a deal to insinuate himself into defendant's life and to provide information on him in exchange for Robertson's release. Defendant told Hohman snitches "should be killed and that snitches breed snitches and their kids should be killed too." Matters came to a head on October 24, 1987, when defendant wrote a note to Hohman about Robertson that said "[t]he serious mother fucker has to go." That same day he told Camolyn Ramsfield, Beiling's daughter, that he believed Robertson was a "federal snitch" and he was going to "take [Robertson] out." She understood that to mean defendant planned to kill Robertson.

That evening, Brandi Hohman went with defendant to a bar in Mountain View where they met two Freedom Riders, Greg Hosac and Rex Sheffield. Defendant had asked them to meet him there to talk about whether Michael Robertson had been lying about the messages he was carrying back and forth between defendant and club members. After defendant talked to Hosac he told Hohman that Hosac had confirmed his suspicion that Robertson "had been lying to him and the club." Shortly afterwards, Robertson appeared at the bar, to defendant's and Hosac's evident displeasure. Robertson did not join them but remained at the other end of the bar. Later, defendant disappeared and Hohman went looking for him. She found him behind the bar, talking to Sheffield. Defendant told her to leave them. According to Hohman, when defendant and Sheffield returned to the bar, they invited Robertson to join them and "everybody all of a sudden was best friends again." Defendant invited Robertson to drive with

11

him and Sheffield to Santa Cruz to buy drugs. Robertson said he preferred to return to the motel with Hohman, but defendant shamed him into going with a remark about "being one of them women." Defendant, Sheffield, and Robertson departed in a car Sheffield had borrowed from Joseph Martinez; the three men were all in the front seat, with Robertson in the middle. Hohman returned to the motel where she, defendant, and Robertson had been staying.

Around 8:15 p.m., Ellen McDonough and her husband were driving to dinner on Highway 17 when she saw a car on the shoulder and a man running around it. The man's hair was cut in an unusual style that looked like a horse's mane; the hair ran down the middle of his head with the sides shaved. This was defendant's hairstyle. When she and her husband returned from dinner, she saw a sheriff's car and highway patrol car beside the vehicle. She told her husband to stop so she could report what she had seen earlier. Santa Cruz County Deputy Sheriff Joseph Hemingway was one of the officers at the scene. He observed blood smears on the front seat, window, and doorjamb, as well as a blood-soaked bedsheet on the passenger side floorboard. The car was registered to Gilbert Martinez, who was the uncle of Joseph Martinez. Defendant's and Sheffield's fingerprints were found in the car.

Around 3:00 a.m. on October 25, Brandi Hohman was awakened by knocking at the door of the motel room. When she opened it, defendant and Rex Sheffield came in. They were later joined by Greg Hosac. Hosac said the police had found the car with blood in it and said "something about they thought that [defendant] had done it." Hosac and Sheffield were discussing alibis when defendant interrupted and "told them they didn't have to tell the police anything." At some point they realized that one of the motel room keys must still be on Michael Robertson's body and they quickly vacated the room. Defendant and Hohman went to Der Ghan, another motel.

12

At Der Ghan, defendant shaved his head so he was completely bald. He told Brandi Hohman he had shot Michael Robertson in the head while Rex Sheffield was driving because Robertson had said something that offended one or both of them, and that after removing Robertson's body from the car he slit Robertson's throat. When the car ran out of gas, he and Sheffield abandoned it and walked to a restaurant, where they called a friend who came for them. Later that day, Greg Hosac and his wife came to the motel and defendant acted out for them "shooting [Robertson] in the head and cutting [his] throat." Defendant hid a bag containing his and Sheffield's bloody clothes and his knife behind a ceiling tile in the room.

The next day, defendant was arrested for failure to appear in the Christopher Walsh case. Brandi Hohman called her mother to pick her up. She took the bag from the ceiling and hid it in her mother's attic, where police eventually recovered it.

### e.  Defendant's Flight and Arrest

Following his arrest on October 26, defendant again made bail. A Massachusetts native, defendant fled to the East Coast with his girlfriend Karen Dolan, their three children, and his other girlfriend Brandi Hohman. Hohman was arrested at an airport in Boston as she was attempting to return to California. Dolan and her children stayed in Massachusetts with Dolan's sister, who prevented defendant from communicating with Dolan. Angered by this, he told Laurel Beiling in a phone call he was going to kill Dolan's sister and her four children. Beiling, fearing for the children's lives, informed the Santa Cruz County District Attorney's Office of defendant's location. On January 28, 1988, defendant was arrested in a New York City hotel.

13

### 3. Defense Guilt Phase Case

As to the murder of Sharley Ann German, the defense offered evidence that defendant was in Massachusetts when she was murdered and insinuated that she was killed by Connie Ramos, the widow of Frank Ramos. The defense maintained that Rex Sheffield killed Parr and Robertson,[4] and presented evidence attacking the credibility of prosecution witnesses Brandi Hohman and Laurel Beiling. Another theme of the defense was that defendant was a braggart who took credit for crimes he had not committed.

Defendant testified he was in Massachusetts and New Jersey when Sharley Ann was killed on April 25, 1986, and he did not return to California until two days before her funeral. He claimed he learned of her death in a phone call from Karen Dolan. Dolan corroborated his alibi. While in Massachusetts, defendant saw some old friends, three of whom testified they remembered seeing him in late April. Defendant testified that when he returned to California, a friend named Glenn Johnson picked him up at the San Francisco airport and drove him home. Johnson testified that he picked defendant up three or four weeks before Johnson's birthday, which falls on May 27.

The defense also presented evidence that Connie Ramos was investigated for Sharley Ann's murder because of the feud between the two families following Frank Ramos's death. Police investigated inconsistencies in Ramos's account of her whereabouts the day Sharley Ann was killed. Police also received an anonymous tip that a woman matching Ramos's description was observed entering Sharley Ann's house the day of the murder, that sounds of a quarrel were heard,

---

[4]    Rex Sheffield was originally charged with the Parr and Robertson murders along with defendant but their cases were severed. At the time of defendant's trial, Sheffield had not been tried.

and the woman emerged carrying a rust-colored towel.[5]  A search warrant was executed on Ramos's car and residence and police recovered a rust-colored towel from the car.  Police also removed knives from the residence.

Defendant denied telling Brandi Hohman that he had killed Sharley Ann. He claimed she was lying to avoid being charged as an accessory to the Parr and Robertson murders and because he had ended his relationship with her and returned to Karen Dolan.  He admitted talking to Theodore Grandstedt about the murder but denied telling Grandstedt he had committed it.  He testified, however, that he had told both Hohman and Grandstedt about crimes he had not actually committed to impress them.  Defendant also denied having told Robert Fulton or his wife, Marlene, that he had killed Sharley Ann.  He claimed they were part of a conspiracy against him by the Freedom Riders that developed after the Parr murder.  Finally, defendant testified that he came into possession of Sharley Ann's car after her death because Geary loaned it to him.

Defendant acknowledged that he and Brandi Hohman had gone to a party at David Parr's house attended by murder victim Herbert Parr, but he denied having any animosity toward Herbert Parr and claimed there was friction between Parr and Rex Sheffield, who was also at the party.  Like Hohman, he testified that he invited Parr to Laurel Beiling's house to continue the party and that at some point Sheffield and his wife arrived.  He asserted that Sheffield was upset with Parr and wanted to beat him up because Parr claimed to know people he did not know. Defendant said he defended Parr.  He testified that he, Parr, and Sheffield went to the backyard, where Parr began talking about a tattoo he claimed to have gotten in Vietnam.  Sheffield then "snapped" and began stabbing Parr.  Defendant started to

---

[5]     At least one officer investigating Sharley Ann's murder believed that Geary had arranged for someone to make the anonymous call implicating Connie Ramos.

15

leave but then returned and saw Parr was dead. He admitted helping to remove Parr's body from Beiling's residence, burying it, and renting a U-Haul truck for Parr's motorcycle, which he dismantled.

Danny Payne, who had been in county jail with Sheffield, testified that Sheffield told him about two murders he had committed, one of them involving a person Sheffield shot and buried in a backyard.

Defendant testified that after the Parr murder, which occurred on August 14, 1987, he began to distance himself from the Freedom Riders. In September 1987, he met Michael Robertson, who had just been released from prison. Robertson became his best friend and acted as his go-between with the Freedom Riders, carrying messages back and forth. He and Robertson met with Rex Sheffield — who at this point was not a Freedom Rider — and resolved their differences. Defendant, however, remained wary of the Freedom Riders. On October 24, he returned a page from Greg Hosac, president of the Freedom Riders, who told defendant he had Karen Dolan and her (and defendant's) children and wanted to talk to defendant. Defendant agreed to meet Hosac at J.W.'s bar in Mountain View.

Defendant went alone, but later both Michael Robertson and Rex Sheffield separately showed up at the bar. Defendant resolved his differences with Greg Hosac and then spoke to Sheffield. Defendant told Sheffield he had not told Robertson anything about Parr's killing and burial. Sheffield said Robertson was "no good." Nonetheless, the three men — defendant, Sheffield and Robertson — left the bar in Sheffield's car to drive to Santa Cruz to buy drugs. On the way, the car stopped. Sheffield got out and looked under the hood. He returned to the car, took a gun from beneath the driver's seat, and shot Robertson in the face. Defendant was shocked and "scared," but he assisted Sheffield in moving the car out of the road and disposing of Robertson's body.

16

Defendant denied telling Brandi Hohman to conceal his knife and clothes, and he denied telling her that Robertson had died more easily than Sharley Ann. The defense presented two witnesses who testified Hohman was promiscuous, a drug user, and a liar. Another defense witness portrayed Laurel Beiling as mentally unstable and untruthful, while still another testified Beiling told her defendant killed Parr but later recanted.

### 4. Rebuttal

Using phone records, the prosecution presented evidence that in the week up to and including April 10, 1986 (15 days before Sharley Ann German was murdered), a number of collect telephone calls were made from the East Coast to defendant's home in San Jose, and that on April 10, a collect call was made from a public telephone at the San Francisco airport to defendant's home (indicating that defendant may have returned from the East Coast on that date, and was trying to obtain transportation back to his home), but that no long distance calls from the East Coast were charged to defendant's telephone after April 10. Karen O'Neal, who had been married to defendant's friend John Mercuri, testified that defendant threatened to kill her and members of her family if she laid claim to any marital assets during the divorce proceedings. As a result, she signed away everything to Mercuri. Paul Doty worked as a night clerk at a Massachusetts motel where defendant and Karen Dolan were staying. The police arrived at the motel and took Dolan and their children, defendant not being present. Defendant called Doty and threatened to "blow [his] brains out" because he evidently believed Doty had informed the police of defendant's whereabouts. John Acord, a police officer from defendant's home town of Wrentham, testified to a 1979 incident during which defendant attempted to slash him with a knife, leading to defendant's arrest and conviction for assault with a deadly weapon.

17

**B. Penalty Phase**

*1. Prosecution Case*

At the penalty phase, the prosecution primarily relied on evidence it had presented at the guilt phase: the circumstances of the charged crimes (see § 190.3, factor (a)) and other episodes involving defendant's use of force or threat of force, including his threats to kill Karen O'Neal and members of her family, his attack on Christopher Walsh, and his threat to kill Paul Doty (*id.*, factor (b)). The prosecution presented a certified copy of defendant's 1979 felony conviction for assault with a deadly weapon on Officer Acord.

*2. Defense Case*

Defendant presented evidence of his religious conversion, his positive influence on other inmates while in custody, his harsh upbringing, and his addiction to drugs and alcohol, as well as expert testimony that he suffered from a form of fetal alcohol syndrome.

Reverend Lawrence Walsh, a jail chaplain, testified that defendant had become a "born again Christian," with an understanding of his faith equivalent to a first-year Bible college student. Defendant, he said, had taken Bibles to other inmates and had been and would continue to be a positive influence on others. Father Jim Mifsud, a Catholic priest, described defendant as "probably the best prisoner" he had ever seen.

Seven law enforcement officers testified about defendant's behavior while in custody in this case. They said that he had behaved well, respected staff and other inmates, and had not created any problems for staff. They predicted that he would continue to benefit the inmate population. A fellow inmate testified that defendant had a calming influence on the witness and other inmates. The program manager for education programs at the jail testified that defendant had earned his GED and high school diploma while in custody. James W. L. Park, a prison

18

consultant, testified that a person sentenced to life without possibility of parole would be assigned to a level 4 or maximum security prison, which he described. He believed defendant would be a useful member of prison society.

Vincent Schiraldi (a social worker with expertise in criminal justice), Gail Stewart (defendant's elder half sister), and Ellen Muzzy (the first wife of defendant's father) testified about defendant's family and upbringing. They portrayed defendant's father as a violent man who physically abused his first wife, defendant, and defendant's mother. As a result of his abuse, defendant's mother became an alcoholic. Defendant's father pushed defendant into playing hockey, lying about defendant's age so he could play in a semiprofessional hockey league. When defendant was 14, he began to drink, with his father's permission, and to come and go unsupervised. At 15, he dropped out of school and began to abuse drugs. When he was 18, he moved out of the family home and left for California.

Dr. Eugene Schoenfeld, a psychiatrist, testified that, based on his examination of defendant, he had found "evidence of a type of fetal alcohol syndrome" attributable to defendant's mother's drinking while pregnant with defendant. In Dr. Schoenfeld's view, fetal alcohol syndrome might lead a person to become antisocial.

### 3. Prosecution Rebuttal

The prosecution called witnesses from Massachusetts who had known defendant and his family. They testified that defendant's father was a kind-hearted person and that they never saw evidence of, nor did defendant ever complain about, his father's violence.

## II. DISCUSSION

### A. Severance Motion

Defendant contends the trial court's denial of his motion to sever the three murder counts constituted an abuse of discretion under state law and also violated his federal constitutional right to due process.[6] The claims lack merit.

#### 1. Background

Defendant and Rex Sheffield were initially charged in the same information with the Herbert Parr and Michael Robertson murders, while defendant alone was charged with the murder of Sharley Ann German. Defendant and Sheffield each moved to sever their cases, and defendant sought separate trials on each of the three murder counts. At the hearing on the motion, defense counsel argued the three murders were unconnected by time, by motive, or by the method of killing, and that trying them together would prejudice defendant because the jury would be influenced to his detriment by the number of murder counts.

---

[6] As to this and other federal constitutional claims, defendant does not specify which federal constitutional provisions he relies on, nor does he say whether he raised the federal claims below. Nonetheless, as to each of his federal constitutional claims, "it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the United States and California Constitutions. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.) We apply this principle throughout this opinion in considering federal constitutional claims that were not advanced below.

The trial court severed defendant's case from Sheffield's but denied defendant's request to sever the murder counts. It reasoned that all of the counts were "of the same class," that they were "related factually to some extent," and that "in some respects the circumstances of each case [were] similar and some of the evidence of one count [was] cross-admissible and interwoven with the others." The court stated: "The only real possibility of prejudice . . . would be from the jury adding up counts against a defendant and letting the evidence of one murder eliminate the possible reasonable doubt as to another . . . . [¶] But because of the jury instructions to the contrary and the fact that this Court will pre-instruct the jury as to adding up [*sic*] each count separately without regard to the verdicts on the other counts, prejudice will be so diminished as to guarantee . . . defendant a fair and separate trial on all counts charged against him."

Although the trial court did not preinstruct the jury regarding its obligation to decide each count separately, its closing charge included this instruction: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each count must be stated in a separate verdict."

### 2. *Discussion*

" ' "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 848.) This preference is embodied in Penal Code section 954, which states in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the

21

different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." Here, the three murders and the related charges (conspiracy to commit murder and robbery) are of the same class, because they are all " 'assaultive crimes against the person.' " (*Capistrano*, *supra*, at p. 848.) Thus, they were properly joined unless the defense made such a " 'clear showing of potential prejudice' " that the trial court's denial of defendant's severance motion amounted to an abuse of discretion. (*People v. Vines* (2011) 51 Cal.4th 830, 855.)

In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case. (*People v. Geier* (2007) 41 Cal.4th 555, 575.)

Defendant argues joinder was improper because the evidence of the three murders was not cross-admissible. Cross-admissibility is not, however, a precondition to joinder of charges. "[S]ection 954.1 expressly provides that 'where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning the one offense or offenses *need not* be admissible as to the other offense or offenses before the same trier of fact.' (Italics added.) Thus, 'cross-admissibility is not the sine qua non of joint trials.' " (*People v. Geier*, *supra*, 41 Cal.4th at p. 575.) While the presence of such evidence " 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges' " (*People v.*

22

*Merriman* (2014) 60 Cal.4th 1, 38), the absence of cross-admissible evidence does not bar joinder.

There was, in any event, significant cross-admissible evidence here. For example, Brandi Hohman testified that defendant compared the murder of Sharley Ann German with the Michael Robertson murder and told her Robertson had died more easily. This evidence would have been admissible at separate trials of defendant for each of these murders. Hohman also testified defendant told her that after killing Robertson he removed the boots Robertson was wearing, which defendant had loaned to him, because defendant had worn them when he killed Herbert Parr. This evidence would have been admissible at separate trials of the murders of Robertson and Parr. The three murders also involved a deeply interwoven cast of characters and web of circumstances: Defendant, the victims and the prosecution's witnesses were all in some manner connected to the Freedom Riders and the subculture it represented. The events surrounding the crimes and the crimes themselves took place within the territory in which the club was active and within a time span that essentially paralleled defendant's involvement with the club.

Moreover, defendant has not shown that he was prejudiced by joinder of the charged offenses. None of the charges was more inflammatory than the others. Defendant argues Sharley Ann was more sympathetic than the other two victims, asserting that, unlike Parr and Robertson, she had no criminal record and was not "entrenched in the 'biker' lifestyle and familiar with the violence that accompanied that lifestyle." But there was no evidence that either Parr or Robertson was a hardcore biker. Parr emerges from the trial testimony as someone ridiculed by the Freedom Riders for his desperate desire to be taken seriously as a biker and Robertson, whatever his criminal past, as slavishly devoted to a man who deceived and killed him. Sharley Ann, who was married to

23

a Freedom Rider and participated in the club's activities, was certainly as "entrenched in the 'biker' lifestyle" as Parr and Robertson. Moreover, given her husband's involvement in the Frank Ramos murder, she was "familiar with the violence that accompanied that lifestyle." Accordingly, she was not necessarily a more sympathetic victim than Parr or Robertson.

Nor do we agree with defendant that the evidence that he murdered Sharley Ann was significantly weaker than the evidence of the other two murders. Defendant repeatedly told witnesses he had killed Sharley Ann, describing facts about the crime that the killer would know. Even if the Parr and Robertson cases were *relatively* stronger in that there was more evidence of defendant's guilt besides his admissions, the evidence that he murdered Sharley Ann was not so weak that the jury would be unable to follow the instruction to consider the evidence as to each count separately. And given that the evidence of each murder charge was strong, we reject defendant's claim that joinder was improper because this was a capital case. (*People v. Ochoa* (2001) 26 Cal.4th 398, 423 ["Even where the People present capital charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict."].)

In short, the trial court, after evaluating the relevant factors, found no reason to depart from the statutory preference in favor of joinder of the murder charges. Because, for the reasons described above, defendant failed to make a clear showing of potential prejudice, the court did not abuse its discretion under state law when it denied defendant's motion to sever the charges.

Defendant maintains that joinder, even if proper under state law, resulted in violation of his federal constitutional rights. In evaluating that claim, "we must . . . inquire whether events after the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*People v. Merriman*, *supra*, 60 Cal.4th at

24

p. 46, italics omitted.) Here, defendant fails to point to any specific event or events that would demonstrate gross unfairness. He argues that the court failed to preinstruct the jury about its duty to consider each charge separately. This omission, however, does not demonstrate unfairness. As defendant concedes, the jury was so instructed at the end of the guilt trial and before it began its deliberations, and defense counsel reiterated the point in his closing argument to the jury. "We presume the jury understood and followed the instruction." (*People v. Homick* (2012) 55 Cal.4th 816, 873.)

Defendant also asserts the trial court's instruction was insufficient to prevent the jury from using evidence of one murder to find he had a predisposition to commit the other murders, likening this case to *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073. In *Bean*, the trial court denied the defendant's motion to sever two counts of murder, each involving a residential robbery during which the defendant allegedly murdered a female victim. The evidence of the defendant's participation in the first murder was significantly stronger than his participation in the second murder and, even though the evidence was not cross-admissible, the prosecutor argued the modus operandi for both was the same, thus "repeatedly encourag[ing] the jury to consider the two sets of charges in concert." (*Bean*, *supra*, 163 F.3d at p. 1084.) Emphasizing the weakness of the evidence of the second murder as compared to the first, the lack of cross-admissible evidence, and the prosecutor's modus operandi argument, the Ninth Circuit concluded that joinder of the charges violated the defendant's due process rights. (*Id.* at pp. 1085-1086.) Given those circumstances, it rejected as inadequate the instruction directing the jury to consider the evidence of each count separately. (*Id.* at p. 1084.)

Here, by contrast, there was no joinder of a weak case to a strong case and there was cross-admissible evidence. Although the prosecutor briefly noted in his

25

closing argument the similarities in the manner in which Robertson and Sharley Ann were killed, he made no serious attempt to persuade the jury that these similarities demonstrated defendant's guilt of the two crimes, nor did he suggest any similarity between those crimes and the murder of Parr. And the jury's acquittal of defendant on the charge that he conspired to murder Parr provides an additional indication of its ability to consider the evidence of each charge separately. Thus, he "has not met his high burden of establishing that the trial was grossly unfair and that he was denied due process of law." (*People v. Soper* (2009) 45 Cal.4th 759, 783.)

### B. Jury Issues

#### *1.* Wheeler/Batson *Motion*

Defendant contends, as he did at trial, that the prosecutor improperly exercised two racially based peremptory challenges against African American prospective jurors, in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). We disagree.

##### *a. Background*

Voir dire of the prospective jurors began on March 19, 1991. Over the course of the voir dire, 163 prospective jurors were questioned.

Defendant's challenge focuses on Prospective Jurors D.C. and R.A., both African American men. In his juror questionnaire, D.C. noted his father had been a police officer in Louisiana from the 1960s to the 1980s. In response to question 47, which asked about favorable or unfavorable experiences with law enforcement, he wrote "Ticket for expired liscence [*sic*] tags. 1 day exp[ired]." Question 55(J) asked whether the prospective juror strongly or somewhat agreed, was neutral, or strongly or somewhat disagreed with the statement: "I think that I would require that the prosecution prove its case not only beyond a <u>reasonable</u>

26

doubt, as the law requires, but beyond <u>all possible doubt</u> and to an <u>absolute certainty</u> before I would convict anyone of a serious crime." D.C. checked the line for "Somewhat agree." Question 58(B) asked whether the prospective juror strongly or somewhat agreed, was neutral, or strongly or somewhat disagreed with the statement: "If someone brags about doing something wrong, he should be punished — whether or not he actually did it." D.C. checked the "Strongly disagree" line. In the space provided for an additional explanation, he wrote: "Someone could be joking around[.] [H]ow do you know if they are telling the truth."

D.C. was voir dired on April 4. The prosecutor asked if he held any grudges because he was ticketed for his expired license plate one day after the registration expired. D.C. said he did not, explaining: "It was my fault. I was one day — I was late." The prosecutor inquired whether anything about his father's career in law enforcement would make him "tend to gravitate toward one side or the other," to which he responded, "No, there isn't." The prosecutor also asked a number of other questions about his ability to be an impartial juror.

As to Prospective Juror R.A., in his juror questionnaire he checked "Strongly agree" on question 55(J), which asked whether the prospective juror would require more than proof beyond a reasonable doubt to convict. With respect to personal information, R.A. indicated in response to question 11 that, although his son lived with him, he did not know what educational level his son had completed or his occupation, if any. For hobbies, he wrote: "My hobby is amateur magic." R.A. had also been a state capitol police officer in Pennsylvania for two years.

R.A. was voir dired on April 3. In response to a question from the trial court about whether, if defendant was convicted, he could consider both life without the possibility of parole and death, R.A. answered, "Yes, but I would have

27

to be convinced pretty well," presumably before voting for death. He went on to say, however, that he would not automatically vote for one penalty over another. During his questioning of R.A., the prosecutor focused on R.A.'s understanding of the burden of proof. With respect to R.A.'s response to question 55(J), which indicated he strongly agreed that the prosecutor would have to prove its case beyond all possible doubt, the prosecutor asked: "You recognize that that would mean that your personal standard is higher than the law requires?" R.A. answered, "No. But I just wouldn't want to have any doubt in my mind." The prosecutor read him the reasonable doubt instruction and said, "We're not talking about being convinced beyond all possible doubt. [¶] Do you see that difference?" R.A. responded, "I see the difference, but still I just have to feel satisfied with myself that — " The prosecutor broke in, saying, "Okay. And that's understandable," but asked if R.A. could follow the law. He answered, "Well, I would be inclined to feel that I need to feel the certainty within myself, you know."

The trial court resumed questioning. To illustrate the reasonable doubt standard, it gave the example of R.A. putting his garbage out on the night before collection and returning from work to find it gone, and suggested that in this scenario there would be no reasonable doubt the garbage collectors had collected it even though it was also possible the garbage can had been knocked over and the garbage eaten by a "pack of wild dogs." The court asked, "Does that help you out at all?" R.A. replied, "Sure." The prosecutor concluded his voir dire by asking some additional questions about R.A.'s ability to be impartial.

On April 29, selection of the 12 jurors and four alternates began. Twelve prospective jurors were called to the jury box and the parties were permitted to exercise peremptory challenges. D.C. was among the first 12 prospective jurors. The prosecutor used his first peremptory challenge to excuse D.C. Both sides exercised additional peremptory challenges and additional prospective jurors were

28

seated to replace those who had been excused. The prosecutor used his fifteenth peremptory challenge to excuse R.A. At that point, defense counsel asked for a sidebar conference to "put on the record that the district attorney has excused the second and only remaining black juror from the panel." He continued, "the defendant is denied a representative cross-section. Those were the only two black jurors in the panel out of the four panels called from this entire area. They both have been eliminated by peremptories." The prosecutor replied: "Your Honor, I would be more than happy to respond as to the reasons, but I don't think that it would be appropriate to do it here." He asked for an in camera conference. The trial court denied his request and directed him to proceed.

The prosecutor prefaced his remarks with the observation, "I think that it's interesting [defendant] is objecting is that the People have excluded the two black jurors and the People are conscientiously [*sic*] discriminating against a particular class. [¶] I think [defendant] has been involved in white supremacy. If anything, he would like not to have black members on this particular jury."**7**

Regarding D.C., the prosecutor said, "[H]e is a 33-year-old black male, married, three kids, renting. [¶] There were answers in his questionnaire that talked about that his father was a police officer back in the 60's. However, he recalled and spoke of the prejudice. He mentioned the license tag and so on. [¶] But primarily there was a question which asked how he felt about if somebody bragged about something, whether they could be punished — whether or not they actually did it. He put down in response to that, in effect, that a bragger could simply be joking about something. [¶] [Defendant's] defense in this particular case is that his confessing to all three murders is that he was only bragging, he was

---

**7** No evidence of defendant's participation in any White supremacy group was presented at trial.

not actually telling the truth about what it was he was confessing to. And I didn't like the answer in terms of a bragger could be joking. [¶] In connection with the demographics in connection with some other answers, 55-J, he was talking about strongly agreeing . . . proof should be more than beyond a reasonable doubt, to an absolute certainty."

The court then asked about R.A. The prosecutor said: "[R.A.] is a 59-year-old black male, divorced with two kids, he rents. As I indicated, the other juror is a renter. [¶] In terms of the demographics with not owning a home, and answer 11 on the questionnaire, the question about his children, and it was something in the answer indicating that lack of knowledge or something about certain circumstances regarding his children. [¶] [R.A.], for what it's worth, had a hobby as an amateur magician, which, in any event, I don't like the situation of one of the potential jurors being involved in magic, sleight-of-hand. [¶] He also indicated in terms of the burden of proof involved, a phrase during the voir dire where he said, 'I'd have to be convinced pretty well,' and my feeling from that was, the context of which it was said . . . something about the way that he said it in connection with the questioning that he believed that he may require burden of proof over and above what the law required. [¶] As far as the death penalty was concerned — and I had another note down here. My impression was he wanted more than proof beyond a reasonable doubt. [¶] In terms of the death penalty he was somewhat equivocal. As I recall, I summarized rather than giving him a rating on the death penalty how he felt. He was not sure of his feelings, except that he was ambivalent about that. [¶] And quite frankly, I would like people a little bit more, in this particular case, more indicative one way or the other how they feel about it rather than a question mark, that can't indicate how they feel about it."

30

At the conclusion of the prosecutor's presentation, the trial court ruled: "The court finds that the People are not intentionally excluding one class of people, and the People's reasons for exercising the peremptory challenges are valid reasons."

### b. Discussion

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citation.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." (*People v. Lenix* (2008) 44 Cal.4th 602, 612.)

"A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.)

Here, the trial court did not determine whether a prima facie case had been established. Instead, after the prosecutor gave his reasons for excusing the prospective jurors, the court found those reasons to be credible and ruled that the defense had not demonstrated that they were based on race. Because the court never decided whether defendant had made a prima facie showing that the

31

challenges were impermissible, the Attorney General correctly acknowledges that the question whether he did so is moot. (See *People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1 ["When a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination."]; *People v. Williams* (2013) 58 Cal.4th 197, 280-281.) Thus, the sole question before us is whether the trial court correctly ruled that the defense did not satisfy its burden of demonstrating discriminatory motivation at the third stage of the *Batson* inquiry.

The prosecutor's " 'justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. . . . All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)

" 'We review a trial court's determination regarding the sufficiency of a prosecutor's justification for exercising peremptory challenges " 'with great restraint.' " [Citation]. We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory

justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " (*People v. Lomax* (2010) 49 Cal.4th 530, 571.)

Also relevant here, in light of defendant's appellate arguments, are principles pertaining to comparative juror analysis, which, on a claim of race based peremptory challenges, compares the voir dire responses of the challenged prospective jurors with those of similar jurors who were not members of the challenged jurors' racial group, whom the prosecutor did not challenge. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 (*Miller-El*) ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."].) "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 622.) Where, as here, the comparative analysis was not made at trial, "the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges." (*People v. Jones* (2011) 51 Cal.4th 346, 365.) Therefore, "an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 483.) When a defendant asks for comparative juror analysis for the first time on appeal, we have held that "such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 624.)

### i. D.C.

The prosecutor explained that he excused D.C. "primarily" because of his answer to question 58(B), which pertained to bragging. The prosecutor also gave

additional reasons: He was troubled by D.C.'s reaction to being ticketed for a vehicle registration violation and by his answer to question 55(J), in which he somewhat agreed with the proposition that the prosecutor should be held to a higher standard of proof than reasonable doubt. Defendant contends the prosecutor's stated reasons for discharging D.C. were pretexts for racial discrimination.[8] We address his contentions regarding each of the prosecutor's reasons.

As noted, D.C. checked the line "Strongly disagree" for the statement in question 58(B): "If someone brags about doing something wrong, he should be punished — whether or not he actually did it." He added in explanation: "Someone could be joking around[.] [H]ow do you know if they are telling the truth." The prosecutor explained he was concerned about this answer because he anticipated one line of the defense would be that defendant bragged about criminal activity he had not actually committed. (This indeed proved to be the case.)

Defendant contends this explanation was equally applicable to several White jurors whom the prosecutor did not challenge. We disagree. Although 12 of the seated jurors and alternates checked the same line in response to the statement, only two of them, like D.C., offered an additional explanation: Seated Jurors L.R. and M.A.S. L.R. wrote: "bragging is just talking, not committing a

---

**8** In his opening brief, defendant claims the prosecutor exercised his peremptory challenge against D.C. in part because he was a renter, but his reply brief does not mention this claim. In any event, we agree with the Attorney General that, read in context, the prosecutor's reference to D.C.'s status as a renter, along with his marital and parental statuses, were descriptive and not reasons for his challenge.

34

crime."[9]  M.A.S. wrote:  "People say a lot of things that they often don't mean or to show off for others."

Because defendant did not raise the issue at trial, the prosecutor was not given the opportunity to explain his reasons for dismissing D.C. while later retaining L.R. and M.A.S.[10]  Under these circumstances, we have said that "a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors." (*People v. Jones*, *supra*, 51 Cal.4th at pp. 365-366.)  In conducting this inquiry, we bear in mind that comparative juror analysis is not simply an exercise in identifying any conceivable distinctions among prospective jurors.  "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Miller-El*, *supra*, 545 U.S. at p. 247, fn. 6.)  Rather, because the ultimate question before us concerns the

---

**9**      Defendant contends all 12 of the jurors who checked the line "Strongly disagree" to question 58(B) should be considered for purposes of comparative analysis.  But the prosecutor specifically referred to D.C.'s written explanation: "He put down in response to that, in effect, that a bragger could simply be joking about something . . . .  And I don't like the answer in terms of a bragger could be joking."  It was the additional explanation, not the checked response, on which the prosecutor relied.  Only L.R. and M.A.S. gave comparable responses.

**10**      Because of the structure of the jury selection process in this case, the prosecutor would not have had occasion to directly compare D.C. with L.R. and M.A.S. when he exercised his challenge.  Jury selection began when a group of 12 prospective jurors was seated in the jury box.  When each side exercised a challenge, other prospective jurors were called in random order to take the place of the excused juror.  D.C. was among the first 12 called to the jury box.  Although the prosecutor would likely have compared D.C. to other prospective jurors sitting in the box at the time, L.R. and M.A.S. were not called into the box until later in the process, and the prosecutor could not have known at the time he excused D.C. when, or whether, L.R. and M.A.S. would ever be considered for selection.

prosecutor's motivations in exercising the challenge in question, we must ask whether there were any *material* differences among the jurors — that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges. (Cf. *id.* at p. 247 [finding "strong similarities as well as some differences" between a challenged African-American juror and White jurors, and concluding that the differences were not "significant" in light of the record as a whole].)

Here, although all three prospective jurors gave similar responses to question 58(B), their responses to question 55(J) — also cited by the prosecutor as a reason for striking D.C. — were notably different. That question asked whether the prosecutor should be held to a higher standard of proof than beyond a reasonable doubt. While L.R. answered "Somewhat Disagree" and M.A.S. answered "Strongly Disagree," D.C. answered "Somewhat Agree." As the prosecutor made clear in explaining his challenges against both D.C. and R.A., the jurors' attitudes toward the reasonable doubt standard was an important consideration that informed his decisions about how to use his peremptories.

The questionnaire also asked a series of questions regarding the prospective jurors' feelings about the death penalty. Asked about his "general feelings regarding the death penalty," D.C. responded: "I feel it[']s fair according to the case in which it is involved." In response to a question asking about feelings about the adage "an eye for an eye," D.C. responded: "It is not one that I live by." With respect to the adage "thou shalt not kill," D.C. responded: "It is an adage or commandment that I live by." In response to the question concerning the circumstances, if any, in which he believed the death penalty is appropriate, D.C. responded: "First degree murder that was something horrible, maybe multiple murders when someone would kill several people for no reason but just doing it."

36

By contrast, L.R. described her general feelings about the death penalty as follows:  "In some cases, when the defendant is proved definitely guilty, I think it should happen.  I can't see a person sitting in jail for the rest of their lives, but only in extreme cases where there is no other way."  With respect to the adage "an eye for an eye," L.R. responded:  "I don't believe in it.  But I do believe in punishment for people who cannot live in society without hurting others."  Asked about the adage "thou shalt not kill," L.R. answered, "If there is no other answer, then I think we do society [and] the person a favor."  In response to the question concerning the circumstances, if any, in which she believed the death penalty is appropriate, L.R. responded:  "If there is no chance of this person becoming a productive member of society."

Finally, M.A.S. described her general feelings about the death penalty as follows:  "Necessary for extreme cases."  With regard to the adage "an eye for an eye," M.A.S. responded:  "A barbaric concept."  With respect to the adage "thou shall not kill," M.A.S. responded:  "The person who did the murder should have thought of that before committing the crime."  In response to the question concerning the circumstances, if any, in which she believed the death penalty is appropriate, M.A.S. responded:  "Kidnapping, torture and rape — such as the Central Park case, Manson case, treason that endangers the country, murder depending upon the case."

While D.C.'s responses to this series of questions revealed little about his attitude toward the death penalty, other than a general view that it is "fair" in some cases, both L.R. and M.A.S. expressed their belief that the death penalty "should happen" and is "necessary" in certain cases.  D.C.'s responses certainly did not indicate that he would be an unfavorable juror, and the prosecutor expressed no concern about these responses in explaining his reason for challenging D.C.  But the other jurors' expressions of affirmative support for the death penalty in certain

37

circumstances, the nature of which was further explored and clarified during voir dire, would have made them more attractive "in the eyes of a prosecutor seeking a death sentence." (*Miller-El*, *supra*, 545 U.S. at p. 247.) As the prosecutor explained with respect to his decision to challenge R.A.: "[Q]uite frankly, I would like people a little bit more . . . indicative one way or the other how they feel about [the death penalty,] rather than a question mark."

Finally, M.A.S.'s questionnaire indicated she had close ties to a number of people employed in law enforcement and criminal justice administration. Her father had served as the Fresno County District Attorney for 17 years, and her son had attended a Florida police academy and was awaiting an offer from the United States Drug Enforcement Administration. She had longtime friends who were prosecutors and also listed judges among her friends. In this respect, she and D.C. were not entirely dissimilar: D.C.'s father had served as a police officer. But the nature and extent of M.A.S.'s ties to law enforcement and criminal justice administration, which prompted defense counsel to express concern about possible pro-government bias during voir dire, would have differentiated M.A.S. from D.C. from the prosecutor's perspective as well.

With respect to the prosecutor's second reason for striking D.C., the prosecutor explained: "There were answers in his questionnaire that talked about his father was a police officer back in the 60's. However, he recalled and spoke of prejudice. He mentioned the license tag and so on." Defendant claims the prosecutor's statement is evidence of pretext because D.C. said "nothing about prejudice in his questionnaire," nor did he " 'recall[] and [speak] of prejudice' in his voir dire."

Defendant is correct that D.C. did not speak of prejudice in either his questionnaire or at voir dire, but the prosecutor's mistaken recollection that he had done so does not establish that the prosecutor was acting with discriminatory

38

purpose. The prosecutor was attempting to reconstruct the voir dire of a juror that had taken place more than two weeks earlier, in the midst of a voir dire process that had lasted almost a month, over the course of which 163 prospective jurors were questioned. His brief, passing reference to prejudice was linked to D.C.'s written response to the question on the jury questionnaire asking about unfavorable experiences with law enforcement, in which D.C. noted he had been cited for an expired registration only one day after the license plate tag had expired. The prosecutor questioned D.C. about the incident and, while D.C. said he held no grudge against the officer who had cited him, evidently the prosecutor disbelieved that assurance.

The prosecutor, unlike this court, not only heard D.C.'s words, but heard his tone of voice and observed his body language as he denied bearing a grudge against the officer who had cited him. " 'On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' " (*People v. Jones*, *supra*, 51 Cal.4th at p. 363.) Even if the prosecutor's concern about the citation, considered in isolation, might not provide a compelling reason for a peremptory challenge, the prosecutor's mistaken reference to prejudice alone does not establish that the prosecutor's stated reasons were pretexts for discrimination. (See *People v. Williams* (2013) 56 Cal.4th 630, 661 [no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason]; *People v. Williams* (1997) 16 Cal.4th 153, 189 ["a genuine 'mistake' is a race-neutral reason"].)

The prosecutor's third reason for exercising a peremptory challenge against D.C. was his answer to question 55(J), which asked for his views on the statement: "I think that I would require that the prosecution prove its case not only beyond a

reasonable doubt, as the law requires, but beyond all possible doubt and to an absolute certainty before I would convict anyone of a serious crime."  Although the prosecutor recalled that D.C. was "talking about strongly agreeing," D.C. in fact responded that he "somewhat agree[d]" with the statement.  Defendant contends that because two White jurors, D.R. and F.S., responded even more emphatically to the question, checking the "Strongly Agree" line, this justification was also pretextual.  But neither D.R. nor F.S. gave a written explanation in answer to question 58(B) about bragging, as did D.C.  The prosecutor's challenge to D.C. was based primarily on that written explanation, and D.C.'s views on the burden of proof merely provided an additional ground for concern.  Moreover, F.S., unlike D.C., gave questionnaire answers indicating strong support for the death penalty, stating that it was not imposed often enough on first degree murders, again rendering her a more attractive juror from the standpoint of a prosecutor seeking the death penalty.

In our view, the differences between D.C. and the other jurors were significant, if not overwhelming, thus undermining defendant's assertion that the prosecutor's stated reasons for excusing D.C. were merely pretextual.  Moreover, this case did not involve a situation in which "[r]acial identity between the defendant and excused person," or between the victim and the majority of remaining jurors, raises heightened concerns about whether the prosecutor's challenge was racially motivated.  (See *Powers v. Ohio* (1991) 499 U.S. 400, 416 ["Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred."]; cf. *People v. Johnson* (2003) 30 Cal.4th 1302, 1326 [the fact that "this case involves an African–American defendant

40

charged with killing 'his White girlfriend's child' " is "obviously highly relevant" to the determination whether a prima facie case of discrimination existed], overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162; *Wheeler*, *supra*, 22 Cal.3d at p. 281 ["the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention"].) Nor were there any other indications that the prosecutor's pattern of challenges might have been racially motivated. In the end, because the prosecutor's stated reasons for challenging D.C. were both legitimate and credible, we uphold the trial court's ruling that the prosecutor was not motivated by discriminatory intent when he challenged D.C.

### ii. R.A.

According to defendant, the prosecutor offered five reasons for his challenge to R.A. Defendant concedes that three of these — R.A.'s lack of knowledge about his children, his insistence that he would apply an excessively high burden of proof on the prosecution, and his ambivalence on imposing the death penalty — were race neutral and supported by the record. He argues, however, that the other two — R.A.'s status as a renter and the fact he listed as his hobby that he was an amateur magician — were pretextual and masked discriminatory intent.

When asked about R.A., the prosecutor prefaced his remarks by noting, "[R.A.] is a 59-year-old black male, divorced with two kids, he rents. *As I indicated, the other juror is a renter.*" Defendant seizes upon the italicized phrase, which evidently refers to D.C., as proof that R.A.'s renter status was advanced as a justification for the peremptory challenge. But the prosecutor did not cite that as a

41

reason for his challenge to D.C. Moreover, unlike his other reasons for challenging R.A., the prosecutor said nothing more about his renter status as a justification for the challenge. Although his comment that R.A. was a renter was admittedly somewhat ambiguous, we construe it as descriptive, not as a justification for the challenge.

Defendant argues that the prosecutor's reliance on R.A.'s interest in amateur magic as a reason to challenge him, while race neutral, "had nothing at all to do with this case and [is] properly viewed as a pretext for discrimination." We disagree. " ' "[H]unches[,]" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias' [citation]. The basis for a challenge may range from 'the virtually certain to the highly speculative' [citation] and 'even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1316; see, e.g., *Purkett v. Elem* (1995) 514 U.S. 765, 769 [prospective juror challenged "because he had long, unkempt hair, a mustache, and a beard"].) The prosecutor's sleight-of-hand comment reveals some concern with a prospective juror who practiced illusion and deception as a pastime. While certainly "idiosyncratic" and even "arbitrary" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613), the prosecutor's mention of his aversion to having an amateur magician on his jury does not establish that he acted with discriminatory intent, particularly in light of his other, concededly legitimate, reasons for exercising the challenge.

Accordingly, the trial court properly denied defendant's *Batson/Wheeler* motion.

42

*2. Excusal of Juror K.N.*

Defendant contends the trial court improperly discharged Prospective Juror K.N. after it concluded her difficulty in applying the death penalty would substantially impair her ability to serve as a juror. The contention is without merit.

" 'Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 . . . , we consider whether the record fairly supports the trial court's determination that [a prospective juror's] views on the death penalty would have prevented or substantially impaired her performance as a juror.' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 399.) "A trial court may excuse a prospective juror for cause if no reasonable possibility exists the prospective juror could consider imposing the death penalty. [Citation.] The trial court has broad discretion in making this determination. [Citation.] On appeal, we will uphold the trial court's ruling if the record 'fairly support[s]' it, 'accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous. [Citations.]' Prospective jurors often cannot give unmistakably clear answers as to their ability to impose the death penalty, and the trial court, aided by its assessment of demeanor, is in the best position to assess state of mind." (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 60, fn. omitted.)

Applying these principles, we find no abuse of discretion in the trial court's decision to excuse Prospective Juror K.N. In her questionnaire, K.N. demonstrated her discomfort with imposing the death penalty, writing that such a decision and the "the serious nature of this trial . . . [was] beyond what [she] wanted to deal with." She expressed the same reservations during initial questioning by the court, saying she would have "a real hard time with the second phase of the [trial] having to make that decision." She acknowledged that intellectually she could consider both penalties, but commented: "It's not

43

something that I feel very comfortable with and it's something that I would have to live with the rest of my life." She told the prosecutor, "If I find one in my house, I don't kill a spider. I catch them and take them outside. I don't want to have anything to do with another person's death." Her voice shook as she was being examined about the penalty phase and when she left the courtroom she slammed the door in apparent anger. Three days later, she asked the trial court to excuse her, reporting that the prospect of serving on the jury had left her unable to sleep the night following her voir dire. The court asked if her "emotional state" would make it difficult for her to "pay attention" to the trial. She replied, "Well, if Monday night was any indication, I probably slept about four hours, you know, [and] I probably will be extremely exhausted." After noting her physical responses to voir dire — the shaky voice and sleeplessness — the court found that her emotional state would substantially impair her ability to serve as a juror, and that service on the jury "would be detrimental to the mental and/or physical well-being of the juror" and "to a fair trial to both sides" because "her emotional state would prevent her from hearing all the evidence and giving the proceedings the proper attention required." She was excused.

K.N.'s answers regarding her ability to vote for a death sentence expressed significant hesitancy. Her reports of the emotional toll the mere prospect of serving on the jury was taking on her reasonably caused the trial court to have concerns about her ability to concentrate and to render a fair verdict. Thus, the court acted well within its discretion in excusing her.

### C. Guilt Phase Issues

#### 1. Instructional Claims

##### a. Alleged Failure to Instruct on Assault as Lesser Included Offense to Robbery

Defendant contends the trial court erred by failing to instruct the jury on assault (§ 240) as a lesser included offense to the robbery of Herbert Parr, charged as count four, which provided the predicate for the felony-murder special circumstance alleged in connection with Parr's murder. Defendant theorizes that, under other instructions, the jury could have concluded he was too intoxicated to have formed the specific intent for robbery but found he had the general intent for assault.

"We have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) Here, defendant concedes that assault is not a lesser included offense of robbery under the statutory elements test, because a robbery can be committed by "force *or* fear" (§ 211, italics added), and a robbery committed by fear does not involve the use of force, which is an element of the crime of assault. (*People v. Wolcott* (1983) 34 Cal.3d 92, 99-100.) But the accusatory pleading charged defendant with robbery by "force *and* fear." According to defendant, this means that an element of force was necessary to the robbery conviction, and that assault was therefore a lesser included offense of the robbery under the accusatory pleading test.

45

Preliminarily, defense counsel stated at trial that, as a tactical decision, the only lesser included offense instructions he sought with respect to the robbery charge were regarding receiving stolen property. Accordingly, the doctrine of invited error bars his claim. (*People v. Horning* (2004) 34 Cal.4th 871, 905 [" '[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence.' "].) In any event, the claim is without merit, as explained below.

In *People v. Parson* (2008) 44 Cal.4th 332, as in this case, the accusatory pleading charged the defendant with robbery by force and fear. Like defendant here, the defendant in *Parson* argued that, under the accusatory pleading test, the robbery "necessarily included the lesser offense of assault" and that the trial court erred in not instructing on that offense. (*Id.* at p. 349.) Declining to address the Attorney General's argument that assault is not included within the crime of robbery, even when the pleading alleges a robbery by force and fear (see *People v. Wright* (1996) 52 Cal.App.4th 203), we concluded that the trial court was not required to instruct on assault in any event because there was no substantial evidence that the defendant was guilty only of that offense, and not of the greater offense of robbery. (*Parson*, *supra*, 44 Cal.4th at p. 350.)

The same reasoning applies here. The only evidence regarding defendant's asserted intoxication was Brandi Hohman's testimony that at Laurel Beiling's house defendant used methamphetamine and defendant's testimony that he also consumed an unspecified amount of tequila and beer at Beiling's. There was no evidence that defendant was or appeared to be intoxicated at any point before Parr's murder, particularly not to the extent that he might not have formed the intent to deprive Parr of his property. There was evidence, however, that

46

defendant wanted Parr's motorcycle, was waiting for Parr at a party, allayed Parr's fear of him by acting in a friendly manner toward him after initially being hostile, invited Parr to Beiling's house, armed himself with Beiling's knife and, with Rex Sheffield, led Parr out to Beiling's backyard where he stabbed Parr to death and disposed of the body by putting it in his car trunk after making sure that Hohman had removed a potential witness — Yoshi — from Beiling's residence. There was additional evidence that after the murder, defendant took Parr's motorcycle, dismantled it, and sold it for parts. Thus, as in *Parson*, there was no evidence from which the jury could have concluded that defendant was so intoxicated that he lacked the intent to rob, and the trial court was not obligated to instruct on assault.

### b. CALJIC No. 2.11.5

Defendant contends the trial court erred by giving CALJIC No. 2.11.5, and asserts the error violated his Fifth, Sixth and Eighth Amendment rights. We reject the claim.

As given here, CALJIC No. 2.11.5 stated: "There has been evidence in this case indicating that a person or persons other than defendant was or may have been involved in the crime for which defendant is on trial. [¶] There may be many reasons why such person or persons is not here on trial. Therefore, do not discuss or give any consideration as to why the other person or persons is not being prosecuted in this trial or whether he or she has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial."

Defendant contends this instruction was faulty because it prevented the jury from evaluating Brandi Hohman's credibility and because it undercut his third party culpability defense, particularly with respect to evidence that Connie Ramos

47

killed Sharley Ann German. Because defendant objected to the instruction only on the latter ground at trial, the Attorney General asserts the initial argument is forfeited. Defendant responds that he did object to the instruction, albeit not specifically as it applied to Hohman, and he argues that in any event no objection was required because the instruction affected his substantial rights. (§ 1259 ["The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].) Without deciding the forfeiture question, we address his claim on the merits. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6.)

Brandi Hohman testified under a grant of immunity. Defendant claims the instruction prevented the jury from considering that fact in assessing her credibility. We rejected a similar claim in *People v. Price* (1991) 1 Cal.4th 324 (*Price*). There, the defendant argued that the trial court should not have given CALJIC No. 2.11.5, contending the "instruction erroneously told the jurors they could not discuss or consider the fact that prosecution witnesses had been granted immunity." (*Price*, at p. 446.) We observed that a challenged instruction cannot be read in isolation but must be "considered in light of the entire charge." (*Ibid.*) Reading CALJIC No. 2.11.5 in that context, we concluded that "a reasonable juror would not have understood it as precluding the jury from considering the immunity granted to prosecution witnesses in assessing the credibility of those witnesses." (*Price*, at p. 446.)

*Price* explained: "The purpose of the challenged instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators. [Citation.] When the instruction is given

48

with the full panoply of witness credibility and accomplice instructions, as it was in this case, a reasonable juror will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered in the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.] Although the instruction should have been clarified or omitted [citations], we cannot agree that giving it amounted to error in this case." (*Price*, *supra*, 1 Cal.4th at p. 446.) We have applied *Price*'s reasoning to reject similar challenges to CALJIC No. 2.11.5 in several other cases involving the testimony of an immunized witness. (*People v. Valdez* (2012) 55 Cal.4th 82, 148-149; *People v. Brasure* (2008) 42 Cal.4th 1037, 1055-1056; *People v. Lawley* (2002) 27 Cal.4th 102, 162-163; *People v. Cain* (1995) 10 Cal.4th 1, 34-35.)

As in those cases, defendant's jury was further instructed with CALJIC No. 2.20, which listed the criteria for the assessment of witness credibility, including the existence of any "bias, interest, or other motive" on the part of the witness. The jury was also instructed it could consider evidence of a witness's character for honesty. (Defendant introduced evidence that Hohman was not truthful.) Significantly, because Hohman testified that defendant admitted killing the three victims, the jury was also instructed that "[e]vidence of an oral confession [or oral admission] of the defendant should be viewed with caution." (CALJIC No. 2.70 (5th ed. 1988).) Defendant notes that — unlike the cases cited above — no instructions were given on accomplice testimony. Nevertheless, when we consider CALJIC 2.11.5 in conjunction with the other instructions that were given, we find that it is not reasonably likely that the jury construed the instruction as barring it from considering that Hohman had been given immunity when it evaluated her

49

testimony. (See *People v. Clair* (1992) 2 Cal.4th 629, 663 ["reasonable likelihood" standard applies when evaluating ambiguous instructions].)

Defendant's claim that instructing the jury pursuant to CALJIC No. 2.11.5 undercut his third party culpability defense is similarly meritless. As noted, the purpose of the instruction is to prevent the jury from speculating as to why other participants are not on trial with the defendant or their eventual fates. Nothing in the instruction prohibits a jury from considering evidence that such participants, and not the defendant, committed the charged crimes.

### c. Alleged Failure to Instruct on Target Offense in Conspiracy Instruction

Defendant contends the trial court erred by failing to define the target offense in connection with its conspiracy instructions, specifically CALJIC No. 6.11.

Count two of the information charged defendant with conspiracy to murder Herbert Parr; count four charged him with the murder of Parr. Count five charged defendant with conspiracy to murder Michael Robertson; count six charged him with the murder of Robertson. Pursuant to CALJIC No. 6.10, the trial court instructed the jury that "[a] conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of murder and with the further specific intent to commit such offense followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime."

The trial court further instructed the jury, pursuant to CALJIC No. 6.11 (1989 rev.) (5th ed. 1988): "A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but is also liable for the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such an act

50

was not intended as a part of the original plan and even though he was not present at the time of the commission of such act. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the crime originally contemplated, and if so, whether the crimes alleged in Counts four and six were a natural and probable consequence of the originally contemplated criminal objective of the conspiracy."

During deliberations, the jury sent the trial court a note pertaining only to count two — the charge that defendant conspired to murder Parr — that read: "If the jury decided that there was a conspiracy to commit a crime other than murder and the natural result of that other crime was murder, is the Defendant guilty of conspiracy even though that other crime is not specified in the charges[?] (The Information Document[.]) Reference: Count #2. The other crime would be assault." The court responded: "No. The defendant can only be convicted of crimes for which he has been charged in the information; or of those that are lesser offenses for which the court has instructed you." As previously noted, the jury ultimately acquitted defendant of conspiring to murder Parr.

Defendant contends the trial court erred by failing to specify the "crime originally contemplated" referred to in CALJIC No. 6.11 and that the jury's later question showed that the court's failure to do so allowed the jury to engage in "unguided speculation" regarding the nature of that crime. He argues that the jury's question shows that it was willing to engage in such speculation not only on the conspiracy charge that was the subject of the jury's question, but also on the charges that defendant murdered Parr and Robertson.

Preliminarily, the Attorney General contends that defendant forfeited the claim by not asking the trial court to specify a target crime for the jury. As noted below, defendant relies on *People v. Prettyman* (1996) 14 Cal.4th 248 (*Prettyman*), where we said the trial court had a sua sponte duty to instruct on

51

target offenses in connection with aider and abettor liability.  (*Id.* at p. 266.)  If *Prettyman* applied here in the manner defendant claims, then the trial court would have had a similar sua sponte duty to identify a predicate offense when it instructed pursuant to CALJIC No. 6.11, and defendant could not forfeit the claim by failing to ask the court to do so.  The claim, however, fails on its merits.

In *Prettyman*, we held that when the prosecutor relies on the natural and probable consequence doctrine as to a defendant charged as an aider and abettor, the trial court must give an instruction " 'identify[ing] and describ[ing] the target crimes that the defendant might have assisted or encouraged.' " (*Prettyman*, *supra*, 14 Cal.4th at p. 254.)  Defendant argues that the same principles should apply when, as here, a defendant is prosecuted as a conspirator rather than an aider and abettor.

We rejected a similar argument in *People v. Valdez*, *supra*, 55 Cal.4th 82 (*Valdez*).  In *Valdez*, the defendant was charged with murder but was not charged separately with conspiracy.  The trial court instructed the jury on conspiracy as a theory of liability for murder, and it defined "conspiracy" as " 'an agreement between two or more persons with the specific intent to agree to commit a public offense *such as murder*, and with the further specific intent to commit such offense.' " (*Id.* at p. 151.)  The jury convicted the defendant of murder.  On appeal, the defendant argued the italicized phrase was ambiguous as to the object of the conspiracy and "impermissibly allowed the jury to convict him based on a 'generalized belief that [he] intended to assist and/or encourage unspecified nefarious conduct.' " (*Ibid.*)  Like defendant here, he relied on *Prettyman.*

In *Valdez*, we rejected the defendant's analogy to *Prettyman*, explaining: "Even were defendant correct that *Prettyman*'s holding applies to instructions on conspiracy — a question we do not answer— that holding would not aid him.  We stressed in *Prettyman* that a court's sua sponte duty to identify and describe target

52

crimes 'is quite limited.' [Citation.] It arises only when '*uncharged* target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.' [Citation.] Moreover, even when the duty arises, the trial court 'need not identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider.' [Citation.] In this case, the *only* target offense under the prosecution's theory of criminal liability was murder, and that was a *charged* offense. The prosecution never argued any other target offense and the evidence overwhelmingly pointed only to that target offense. On this record, the trial court's instruction sufficed." (*Valdez*, *supra*, 55 Cal.4th at p. 152.)

Here, defendant was charged with two conspiracies to commit specific murders, as well as with the murders that were the objects of the alleged conspiracies. He was not charged with any other crimes that he might not have contemplated, but might have been the natural and probable consequence of the crimes agreed to in the conspiracies. As in *Valdez*, "the *only* target offense under the prosecution's theory of criminal liability was murder, and that was a *charged* offense." (*Valdez*, *supra*, 55 Cal.4th at p. 152.) Thus, *Prettyman*'s requirement that the jury be instructed on the target crime or crimes in assessing aiding and abetting liability is inapplicable. Defendant's related claim that the trial court was required to define the phrase "originally contemplated criminal objective" in the instruction is even less compelling. The jury was instructed that defendant was charged with conspiracy to commit murder. There was no other criminal objective to which the language in CALJIC No. 6.11 could have referred.

Lastly, defendant argues the jury's note shows it "engaged in 'unguided speculation' " in connection with CALJIC No. 6.11 that may have led it to convict him of the charges that he murdered Parr and Robertson. We disagree. The note pertained only to the charge that defendant *conspired* to murder Parr — a charge

53

on which the jury ultimately found him not guilty — and gave no indication that the jury was attempting to apply the natural and probable consequences rule to the two murder charges.

### d. Uncharged Acts Instruction

Over defendant's objection, the trial court allowed the prosecution to present evidence that defendant had assaulted Christopher Walsh and robbed him of his motorcycle. Prior to trial, the prosecutor explained his theory of the relevance of the evidence. "[T]he People's position is that [it] is relevant . . . in terms of [defendant's] subsequent conduct with Mr. Parr. When he wanted [Parr's] motorcycle, he had learned from Christopher Walsh . . . that if [you] leave a victim alive they can report it to the police, and [Parr] was subsequently killed when [his] motorcycle was taken." Walsh was called and testified to the incident.

In connection with Walsh's testimony, the jury was instructed with CALJIC No. 2.50 and CALJIC No. 2.50.1. At the time of trial, CALJIC No. 2.50 (5th ed. 1988) stated: "Evidence has been introduced for the purpose of showing that the defendant committed [a crime] [crimes] other than that for which [he] . . . is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that [he] . . . has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] . . . [¶] [A motive for the commission of the crime charged;] [¶] . . . [The crime charged is part of a larger continuing plan, scheme or conspiracy;] [¶] [*The existence of a conspiracy*]. [¶] For the limited purpose for which you consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose." (Italics added.)

54

At the time of trial, CALJIC No. 2.50.1 (5th ed. 1988) stated: "Within the meaning of the preceding instruction, such other crime or crimes purportedly committed by [a defendant] must be proven by a preponderance of the evidence. You must not consider such evidence for any purpose unless you are satisfied that [the] . . . defendant committed such other crime or crimes. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence."

In his closing argument, the prosecutor told the jury that the Walsh evidence showed that defendant had "a common scheme or plan" of taking motorcycles by force, first from Walsh and then from Parr. He also argued that, because Walsh had reported the crimes to police, defendant had learned from that experience he could not leave his victim — Parr — alive. He explained: "I submit . . . that from this particular evidence, you can draw the legitimate conclusion that the Walsh situation, no doubt, was fresh on [defendant's] mind. [¶] He knew what happened when he left a live victim with Christopher Walsh. Christopher Walsh is alive today, and because of the fact he's alive today, I submit, in [defendant's] mind, is one of the reasons Herbert Parr is not."

Focusing on the italicized phrase quoted above from CALJIC No. 2.50, defendant contends that phrase led the jury to believe it could convict him of conspiracy to murder *Michael Robertson* simply by finding he had assaulted and robbed Christopher Walsh by a preponderance of the evidence.

Preliminarily, we agree with the Attorney General that defendant has forfeited this claim by failing to ask the trial court to clarify the instruction of which he now complains. (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) As demonstrated below, all parties clearly understood that the uncharged crimes evidence, and therefore the instructions on that point, pertained solely to the Parr murder, not to the charges involving Robertson. Had defendant wished, he could

55

have sought to make that explicit in the instructions, but he failed to seek such clarification. Accordingly, the claim is forfeited. It is also without merit.

"The relevant inquiry [when instructional error is claimed] is whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice.' [Citation.] Also, ' " 'we must assume that jurors are intelligent people and capable of understanding and correlating all jury instructions which are given.' " ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475; see *People v. Thomas* (2011) 52 Cal.4th 336, 356 ["A single jury instruction may not be judged in isolation, but must be viewed in the context of all instructions given."].)

The trial court defined the elements of conspiracy for the jury and described the requirement that the prosecution prove defendant's guilt beyond a reasonable doubt. It also told the jury that whether an instruction applied depended on its factual findings and that it should disregard any inapplicable instructions. As noted above, counsel and the court recognized that the other crimes evidence pertained solely to the prosecutor's claim that it showed a common plan with respect to the robberies of Walsh and Parr. The prosecutor explicitly argued to the jury that this was its relevance. At no time and nowhere in the record was any connection drawn between the Walsh incident and count five, which alleged conspiracy to murder Robertson. Thus, there is not a reasonable likelihood that the jury applied CALJIC No. 2.50 in the manner that defendant now claims, and his contention must be rejected.

### e. CALJIC No. 2.01

Defendant contends that CALJIC No. 2.01, the standard instruction guiding the jury's consideration of circumstantial evidence, was improperly given in this case because it did not also apply to direct evidence. We have frequently rejected

56

this claim.  As we have explained:  "[D]irect evidence, unlike circumstantial evidence, does not generate conflicting inferences.  ' "Circumstantial evidence involves a two-step process—first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence—but direct evidence stands on its own.  So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence." '  [Citations.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 298-299.)

Defendant asserts his case is different because he presented evidence that he boasted about committing crimes he had not committed.  Therefore, he claims, his is "the extremely rare case" where the direct evidence on which the prosecution relied — his confessions that he committed the crimes — was susceptible of a reasonable explanation that did not point to guilt.  He argues that "because there is a reasonable likelihood that the jury applied the instructions so as to permit it to return a guilty verdict based on direct evidence even if that evidence was reconcilable with innocence," his rights under the Fifth and Sixth Amendments to the federal Constitution were violated.  We disagree.

Defendant seems to assume there was no other basis on which the jury could have credited his "bragging" evidence except by application of CALJIC No. 2.01.  This is inaccurate.  Whether the jury believed defendant confessed to the crimes was, fundamentally, a credibility question.  On that issue, the jury was instructed at length about how to evaluate the credibility of the witnesses (Brandi Hohman and others) to whom defendant allegedly made the confessions as well as defendant's own testimony.  In addition to the general instruction about credibility assessment, the jury was specifically told to view evidence of defendant's confessions with caution.  "We presume the jury understood and followed the instruction." (*People v. Homick*, *supra*, 55 Cal.4th at p. 873.)  These instructions applied not only to the preliminary issue of whether defendant made the

57

statements at all but also whether, if he made them, they were true in light of the evidence that he was taking credit for something he had not done. Under these instructions, the jury could have concluded either that defendant did not make the statements at all or, if he did, he was simply bragging and had not actually committed the crimes. Thus, under the instructions given, the jury would have fully assessed whether, even if it believed defendant had made the statements, there was an innocent explanation for them, i.e., that he was a braggart. Essentially, then, the instructions given here authorized the jury to engage in the same analysis of the evidence that defendant contends it would have engaged in had CALJIC No. 2.01 been extended to its consideration of direct evidence.

### f. Aiding and Abetting Instruction

With respect to the special circumstance allegations, the trial court gave a modified version of CALJIC No. 8.80 (1990 rev.) (5th ed. 1988). As relevant here, the court said: "If you find the defendant in this case guilty of murder in the first degree, you must then determine if one or more of the following special circumstances are true or not true: murder for financial gain, murder during the course of a robbery, or multiple murders. [¶] . . . [¶] If you find beyond a reasonable doubt that the defendant in counts four or six was either the actual killer or a co-conspirator or an aider and abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant with intent to kill participated as a co-conspirator with or aided and abetted an actor in the commission of the murder in the first degree, in order to find the special circumstance to be true."

Defendant notes that the instruction required the jury to determine whether he acted with the intent to kill only if it was "unable to decide" whether he was the actual killer or an aider and abettor, but the instruction did not expressly tell the

58

jury what to do if it *did* decide he was an aider and abettor. Thus, he argues, it permitted the jury to find the special circumstance true without finding that he acted with intent to kill. That would be error because, at the time of the murders, the felony-murder special circumstance applied only to those aiders and abettors who acted with the intent to kill. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1147.)

We rejected a similar claim in *People v. Letner and Tobin* (2010) 50 Cal.4th 99 (*Letner and Tobin*). We acknowledged the ambiguity of the instruction at issue, which like the instant one did not explicitly state the intent requirement for an aider and abettor, but we concluded the ambiguity did not rise to the level of a due process violation. (*Id.* at pp. 181-182.) " 'For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*Id.* at p. 182.) Based on our review of the record, we found "no reasonable likelihood the jury misunderstood or misapplied the instruction." (*Ibid.*)

Here, as in *Letner and Tobin*, the prosecutor did not argue that the instruction permitted the jury to find the special circumstance true on the theory that defendant was a nonperpetrator who lacked the intent to kill; rather, he argued that whether or not defendant was the actual killer, he lured Herbert Parr to Laurel Beiling's house so that he could kill Parr and take his motorcycle. The prosecutor did concede that it was unclear whether defendant, Rex Sheffield, or both of them stabbed Parr, noting that one of them might have held Parr while the other stabbed him. But the prosecutor never suggested to the jury the possibility that Sheffield intended to kill Parr and defendant did not, but nonetheless assisted Sheffield in carrying out the crime. Nor did defendant claim to be an accomplice who did not share the perpetrator's intent to kill; rather, he testified that he had nothing to do with the killing. The jury convicted defendant of murdering Parr but acquitted

him of conspiring with Sheffield to commit the murder, suggesting that it was convinced that defendant was the killer but was unsure about the extent of Sheffield's participation in the offense.

Strong evidence supported the prosecutor's argument that defendant carried out a preconceived plan to rob and kill Parr. Defendant, who had already assaulted Christopher Walsh and robbed him of his motorcycle, told Brandi Hohman he wanted Parr's motorcycle. Defendant met Parr at a party, allayed Parr's fears of him, and convinced Parr to go with him to Laurel Beiling's house and then into her backyard, where defendant was armed with Beiling's knife. There Parr was stabbed 18 times. Defendant later arranged to transport and dismantle Parr's motorcycle, buried Parr's body, and told Beiling and Hohman he had killed Parr. Thus, whether or not the jury believed that defendant was the actual killer, on this record it could not have convicted him of murder without also finding he harbored a specific intent to kill. As a result, there is no reasonable likelihood that the jury based its special circumstance finding on the erroneous view that it could do so as to an aider and abettor who lacked the intent to kill.

### 2. Evidentiary Issues

#### a. Exclusion of Evidence of Threats to Defense Investigator

The defense employed Immendorf Investigations to investigate defendant's case. The investigator who worked on the case was Robert Furlan. Lonne Garey was a secretary at the firm. Garey testified for the defense that she had received an anonymous "scary" telephone call. When the prosecutor objected, the defense made an offer of proof, explaining that the caller said: "[T]ell the guy in the Honda next to the BMW, the guy with the big nose, we saw him leave late in the Honda. Tell him he better fucking get off it. We are conveniently located in San Bruno."

In two Evidence Code section 402 hearings, at which both Garey and Furlan testified, Garey identified Furlan as the "guy with the big nose," and said he had been working on defendant's case when she received the call. Furlan testified he drove a Honda and lived in San Bruno. After he interviewed someone named "Frank" about Brandi Hohman at a biker bar in Sunol, some patrons followed him outside and copied down his license plate number. When he talked to Joseph Martinez, a Freedom Rider, Martinez referred to the length of his criminal record in what Furlan believed was an attempt to show "how tough he was." While Furlan was at Martinez's house, Rex Sheffield's wife Gail arrived with two "large white male adults," which made Furlan anxious. Furlan acknowledged he had no proof that Martinez or any other Freedom Riders had made the threatening call. According to the defense, the evidence of the threatening behavior supported its theory that the Freedom Riders were framing defendant for the murders, because it showed that the Freedom Riders did not want Furlan to investigate them.

The trial court excluded the testimony, concluding it was irrelevant because "there's no connection at all between any threats that may have been made as to who made those threats." Defendant argues that the ruling violated his right to present a defense and to a fair trial under the Fifth and Sixth Amendments to the federal Constitution.

"A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence . . . generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[T]he Constitution leaves to [state trial court] judges . . . 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or]

61

confusion of the issues.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 689-690.)
Here, defendant was unable to connect the anonymous call or the threats to Robert Furlan to the Freedom Riders. Even if the jury could have inferred such a connection, the evidence would not have lent any significant support to defendant's claim that the Freedom Riders were trying to frame him for the Parr and Robertson murders. The evidence showed the Freedom Riders were engaged in any number of criminal activities including, for example, the sale of drugs. They would understandably have been reluctant to have defendant's investigator looking into their affairs. Thus, the evidence was, if relevant at all, only marginally so and could have led to confusion of the issues. Accordingly, "[t]he excluded evidence in the present case was not so vital to the defense that due process principles required its admission." (*Cornwell*, *supra*, 37 Cal.4th at p. 82.)

### b. Refusal to release Brandi Hohman's Medical Records

Defendant contends the trial court erred when it denied his request for access to certain medical records of Brandi Hohman, which were generated in connection with a suicide attempt in September 1987. The defense subpoenaed the records from the Santa Clara County Mental Health Administration after Hohman testified at the preliminary hearing that she had attempted suicide because she was afraid defendant might kill her. Santa Clara County Counsel moved to quash the subpoena. After an in camera review of the records, the trial court granted the motion to quash, explaining: "[T]hese materials are in no way essential to vindicate the defendant's right to cross-examine [Hohman.] [¶] There's no reasonable probability that the protected psychotherapy records could materially or in any way assist the defense and . . . the records are of no evidentiary value to the defense in this case."

62

Defendant requests that this court review the records, asserting that they were vital to the issue of Hohman's credibility. "Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' [Citation.]" (*Price*, *supra*, 1 Cal.4th at p. 493.) We have reviewed the records and conclude that the trial court did not abuse its discretion in rejecting disclosure of them. (*People v. Avila* (2006) 38 Cal.4th 491, 607 [no abuse of discretion where trial court withheld access to a witness's parole records].) Even if the court's ruling was erroneous, there was no reasonable probability of a different outcome given that (1) Hohman's fear of defendant was a tangential issue; (2) the impeachment value of the records pales in comparison to the assault defendant launched on her credibility through his own testimony and witnesses who described Hohman as promiscuous, a drug addict and a liar; and (3) the other evidence of defendant's guilt was strong.

### c. Rebuttal Testimony of Glenn Johnson

Glenn Johnson, a defense alibi witness, testified that he had picked up defendant from the San Francisco airport in late April or early May 1986, after Sharley Ann German was murdered. On rebuttal, the prosecutor, who had already cross-examined Johnson, recalled him to the stand. In response to the prosecutor's questions, Johnson acknowledged he had been arrested for driving under the influence several weeks before the date he claimed he picked up defendant from the airport, and that he had lived at a different address than the one he had stated in his earlier testimony. Defense counsel objected that "this has already been gone over on cross-examination." The trial court overruled the objection. Defendant now contends this ruling was an abuse of discretion.

Rebuttal evidence is " ' "evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 336.) "The scope of rebuttal evidence is within the trial court's discretion, and on appeal its ruling will not be disturbed absent ' "palpable abuse." ' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088.) Here, defendant presented evidence, including Johnson's testimony, that he was not in the state on the date Sharley Ann German was killed. Evidence impeaching Johnson was permissible rebuttal because it could not have been presented in the prosecution's case-in-chief, as it only became relevant when the defense called Johnson as an alibi witness. (See *People v. Carter* (1957) 48 Cal.2d 737, 753-754.) We are unaware of any case holding that otherwise proper rebuttal evidence becomes inadmissible if the prosecutor could also have introduced it during cross-examination of a defense witness. The trial court did not abuse its discretion in these circumstances.

### d. Limitations on Cross-examination of Thomas M.

Thomas M., Sharley Ann German's son, testified regarding his discovery of his mother's body. He also acknowledged on direct examination that he had been convicted of a felony burglary. On cross-examination, he testified he had been sentenced to probation, but when defense counsel asked him if he was still on probation, the prosecutor objected on relevance grounds. The trial court sustained the objection.

Defendant argues that the trial court erred when it sustained the prosecutor's objection because Thomas's continuing probation status was relevant to his credibility. Even if we assume that he is correct (see *Davis v. Alaska* (1974) 415 U.S. 308), the error was harmless under any applicable standard. Thomas's testimony was a minor part of the prosecution's case; moreover, the jury was

64

aware that he had been convicted of a felony and had been placed on probation. It is inconceivable that the jury would have reached a different outcome if it had learned that he was on probation at the time of trial.

### 3. Denial of Mistrial Motion

During his cross-examination of defendant, the prosecutor sought to make the point that defendant, before testifying, knew what evidence would and would not be introduced against him. In the latter category was the testimony of witnesses who had made themselves unavailable by asserting the right against self-incrimination. The prosecutor asked, "You also had the opportunity prior to your testimony to look at and consider which witnesses have made themselves unavailable to testify isn't that so?" Defendant replied: "I don't know what you mean." The prosecutor explained, "Well you know which witnesses have made themselves unavailable to be called into court; correct?" Defendant responded, "No. I have no idea who was here and who's not here. I don't know what you mean by 'who's unavailable.' " The prosecutor elaborated: "Which witnesses have been here to testify, which ones have made themselves unavailable; correct?" Defendant responded, "I'm not sure what you mean. You mean by pleading the fifth?" The prosecutor said, "Yeah." Defendant continued, "I've seen who was called in here and who pled the fifth and who didn't plead the fifth." Defense counsel then objected. The trial court sustained the objection, and instructed the jury to disregard the reference.

Defendant moved for a mistrial, arguing the prosecutor "elicited from the defendant on the stand that he was aware of the fact that several witnesses came here and took the Fifth Amendment." The prosecutor replied that, in asking the question, he "was expecting a yes or no answer in terms of that." The trial court denied the motion for mistrial.

Defendant contends the trial court abused its discretion when it denied his mistrial motion after the prosecutor elicited inadmissible evidence regarding witnesses invoking their Fifth Amendment rights. While it is misconduct for a prosecutor to elicit inadmissible testimony, "a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated." (*People v. Tully* (2012) 54 Cal.4th 952, 1035.) Whether or not the prosecutor's questions elicited defendant's testimony that witnesses had asserted the self-incrimination privilege, the court sustained the defense's objection to that testimony and admonished the jury to disregard it. The revelation that unidentified witnesses had "pled the fifth" was not so necessarily prejudicial that we should set aside the normal presumption that the jury followed the court's admonition. (*People v. Thornton* (2007) 41 Cal.4th 391, 441.) Thus, even if the prosecutor's questions were improper, defendant was not prejudiced. Under these circumstances, the court did not abuse its discretion in denying the mistrial motion.

### 4. *Constitutionality of Felony-murder Special Circumstance*

Defendant contends the felony-murder special circumstance violates the Eighth Amendment to the federal Constitution because it permits imposition of the death penalty on the actual killer without a finding of intent to kill or a reckless indifference to human life. We have previously rejected this claim. (See, e.g., *People v. Contreras*, *supra*, 58 Cal.4th at pp. 163-164 [the felony-murder special circumstance is constitutional even though it does not require that an actual killer act with intent to kill or reckless indifference to human life]; *People v. Belmontes* (1988) 45 Cal.3d 744, 794 ["The United States Supreme Court has made clear that felony murderers who *personally* killed may properly be subject to the death penalty in conformance with the Eighth Amendment . . . even where no intent to

66

kill is shown."], disapproved on another point in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Defendant provides no persuasive reason to revisit the issue.

### D. Penalty Phase Issues

#### 1. *Denial of Counsel's Request to Withdraw for Conflict of Interest*

Defendant contends his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution were violated due to a conflict of interest arising from a threat allegedly made by defendant's wife to harm defense counsel's wife should defendant receive the death penalty. The claim is without merit.

#### a. *Background*

On August 20, 1991, just before the penalty phase, Defense Counsel James Campbell requested an in camera hearing to discuss a threat made by defendant's wife, Karen, against Campbell's wife. According to Campbell, Karen told a member of the defense team that "if I lose my husband then [Campbell] is going to lose his wife." At two further in camera hearings, Campbell acknowledged that Karen's statement appeared to be an expression of frustration rather than a serious threat: "[I]t's my belief probably that this was probably not something that is serious or presents any real truth by Mrs. O'Malley, but . . . I think a prudent person would have to at least give some pause for concern over." He continued, "if it is just her in frustration . . . I would be very willing to write it off and dismiss it."

The trial court asked Campbell if he thought the threat came from defendant. Campbell said: "No. Didn't appear that way." But he observed "that since this occurred I've had no contact whatsoever with [defendant] and that's very unusual because he calls almost on a daily basis." Campbell asked to

67

withdraw because "[e]ven though I think this threat and the statement was not something that is of substance really, I think that the very fact of it being made . . . is something that does interfere with the effectiveness of myself in terms of now going forward in the penalty phase and literally arguing and advocating for his life." The court asked defendant what he wanted. Defendant replied, "I would like to have him as my attorney still."

The trial court denied Campbell's request to withdraw, explaining: (1) "Mr. Campbell has always been ready on this case and extremely well-prepared"; (2) "Mr. Campbell has become closely associated with Mr. O'Malley and his family . . . . There's no one more qualified to argue for Mr. O'Malley's life than Mr. Campbell"; (3) "There's no evidence that the statement of Mrs. O'Malley was true or viable or had any substance or was uttered out of anything but frustration, current mental state, in the light of the then existing circumstances [and], it appears Mr. Campbell put little, if any, stock in Mrs. O'Malley's utterances"; (4) "There is no evidence that Mrs. O'Malley's utterances can be attributed to Mr. O'Malley or in any way connected to him"; (5) "Mr. Campbell, as an attorney, has an ethical duty to do as much for his client, whether it's Mr. O'Malley or anyone else, as possible, and has a duty to put personal feelings and beliefs aside"; (6) "Mr. Campbell is under an obligation to bring forth the facts, as he has done so [and] notify the court of what has transpired, of his feelings in the matter, and . . . he has done so," and; (7) "Mr. O'Malley wishes to have Mr. Campbell remain as his attorney and . . . still has faith in Mr. Campbell and his abilities. [¶] The court further finds that Mr. O'Malley is making an informed, reasonable and proper choice in wanting Mr. Campbell to remain as his counsel and still has faith in him despite any prior disagreements, and, therefore, based on this, the court denies the motion to withdraw as attorney of record."

68

### b. Discussion

The Attorney General argues that defendant waived his right to complain about the trial court's denial of his attorney's request to withdraw when he told the trial court he would like his attorney to continue representing him. Defendant responds that there was no waiver because he was not informed of the dangers and possible consequences of proceeding with conflicted representation or of his right to conflict-free representation. (See generally *People v. Jones* (1991) 53 Cal.3d 1115, 1136-1137.) We need not decide whether defendant waived the claim, because we find no error.

" ' "The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest." ' [Citations.] While the classic example of a conflict in criminal litigation is a lawyer's dual representation of codefendants, the constitutional principle is not narrowly confined to instances of this type. [Citation.] A conflict may also arise when an attorney's loyalty to, or efforts on behalf of, a client are threatened by the attorney's own interests. [Citation.] [¶] Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. [Citation.] This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' [Citations.] An actual conflict of interest means 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citation.] Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for

69

counsel's deficiencies, the result of the proceeding would have been different."
(*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309-310.)

"To determine whether counsel's performance was 'adversely affected,' we have suggested that [*Cuyler v.*] *Sullivan* [(1980) 446 U.S. 335] requires an inquiry into whether counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." (*People v. Cox* (2003) 30 Cal.4th 916, 948-949, disapproved on another point in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

Here, the threat came not from defendant but his wife, and defense counsel did not take it seriously. Defendant himself evidently perceived no conflict, as he indicated that he wished to continue with Campbell. Defendant fails to show that counsel "pulled his punches" out of concern for his wife's safety.

Defendant relies on defense counsel's statements during the in camera hearings expressing doubt about his own ability to continue with the case, but he identifies no instance in which the alleged conflict actually affected counsel's performance. To the contrary, defense counsel called numerous witnesses during the penalty trial to demonstrate that defendant's life was worth preserving. Accordingly, we reject defendant's claim.

## 2. Denial of Defendant's Request to Discharge His Retained Counsel

Defendant contends the trial court erred by denying his request to discharge retained counsel. The court did not err.

### a. Background

As noted in the previous part, on September 11, 1991, the trial court denied defense counsel's request to be relieved based, in part, on defendant's desire that counsel continue to represent him. The penalty phase trial began on the morning of September 24. The jury was preinstructed regarding factors in aggravation and mitigation. The prosecutor gave his opening statement. He said that at the penalty phase he would call no witnesses, but would rely on defendant's prior felony conviction and the guilt phase evidence of the circumstances of the crime and defendant's other violent criminal activity. After putting into evidence a certified copy of defendant's felony conviction, the prosecution rested. The defense called its first witness (Lawrence Walton, a jail chaplain), who was examined by both sides before the lunch recess.

When court reconvened, defense counsel informed the court that defendant wanted to make a statement. Counsel said, "I don't know if it really is a Marsden motion, but I think it's a quasi Marsden motion, at least approaches that."[11] Out of "an abundance of caution," the trial court cleared the courtroom and invited defendant to speak.

Defendant said he wanted to "address . . . statements made by the Court" at the September 11 hearing when it denied counsel's request to withdraw, and defendant's "response to a question asked . . . by the Court," specifically, defendant's statement that he "wanted to keep" defense counsel. Defendant told

---

[11] *People v. Marsden* (1970) 2 Cal.3d 118.

71

the court he did "not have confidence in" counsel, but was "more scared of getting someone [he did] not know at all." He complained that defense counsel had "lost all credibility with the jury, but again, I am worried about who would be appointed in his place." He brought up the denial of a pretrial request he had made for second counsel. He asserted the court had been incorrect when it had characterized defense counsel as well-prepared and effective because trial counsel had "ignored or not even read" reports and witness statements prepared by defense investigators. He also alluded to "numerous other issues and incidents" he would raise at "a later date." He asserted further the "defense team" had ignored his "wishes and suggestions." He complained that at times he was told "how [things] were going to be handled, and then the opposite was done, or nothing done at all, which left the situation irrevocable with no . . . input from myself or others." Defendant expressed "no hard feelings" toward defense counsel, adding, "My only problem is how I was represented."

The trial court invited counsel to respond. Counsel acknowledged there had been disputes between defendant and the defense team regarding "how he wanted to present the case." He said he explained to defendant his tactical decisions and, when defendant disagreed, he tried to put defendant's opposition on the record for purposes of appellate review. He alluded to a disagreement he and defendant were having about defendant's wish to call certain penalty phase witnesses whom counsel feared would invite damaging rebuttal. He asked defendant if he wanted to call those witnesses or to continue discussing the matter. Defendant replied, "At this point, we are still discussing that . . . I may agree with you, but I don't know all the facts yet." The court observed, "It's obvious you two have not finished discussing this yet. Is that correct Mr. O'Malley?" Defendant replied, "Correct."

72

The court stated: "[I]t would not appear that any disagreement that you may have had over trial tactics has caused a breakdown in the attorney-client relationship that would substantially, if in any way, impair the defendant's right to effective assistance of counsel. [¶] It would not appear there has been a defense that wasn't presented or that [defense counsel] did not sufficiently consult with [defendant] and adequately investigate the facts and the law involved in this case . . . . [¶] Whether or not this is a real Marsden type situation or not, is hard to say at this point, but [defense counsel] is not going to be relieved at this point."

### b. *Discussion*

Defendant contends the trial court erred by denying a request to discharge his attorney because the court applied the wrong legal standard and the error requires automatic reversal of the penalty phase verdict. Had defendant made such a request, we might agree, but, as we explain below, he did not. The court therefore did not err in denying a request that was never made, regardless of what standard it purportedly applied.

"The right to retained counsel of choice is — subject to certain limitations — guaranteed under the Sixth Amendment to the federal Constitution. [Citations.] In California, this right 'reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain.' [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 310-311 (*Verdugo*).) In *People v. Ortiz* (1990) 51 Cal.3d 975 (*Ortiz*), we held that with regard to *discharging* a retained attorney, a defendant need not demonstrate either that counsel "is providing inadequate representation [citations], or that he and the attorney are embroiled in irreconcilable conflict [citation]." (*Id.* at p. 984.) That standard, rather, is applicable when a defendant seeks substitution of appointed counsel. (*Ibid.*; see *People v. Marsden*, *supra*, 2 Cal.3d 118.)

73

Consistent with the Sixth Amendment right to counsel, a defendant may discharge *retained* counsel "with or without cause." (*Ortiz*, s*upra*, at p. 983.)

"The right to discharge a retained attorney is, however, not absolute. [Citation.] The trial court has discretion to 'deny such a motion if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].' " (*Verdugo*, *supra*, 50 Cal.4th at p. 311.) In this context, while "a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in deciding whether discharging counsel would result in disruption of the orderly processes of justice." (*People v. Maciel* (2013) 57 Cal.4th 482, 513 (*Maciel*).)

The question of which standard applies to a defendant's request to discharge counsel presupposes that such a request was made. In this case, however, unlike *Ortiz*, *Verdugo*, and *Maciel*, defendant did not explicitly request that counsel be discharged. Indeed, while he complained about counsel's representation, he also expressed concern about "getting someone I do not know at all" and "who would be appointed in his place." These comments signify that defendant did not have a substitute attorney in mind, whether retained or appointed. Moreover, his comments toward the end of the hearing showed he and counsel were still discussing defendant's wish to have certain witnesses testify at the penalty phase, indicating, as the trial court found, no irreconcilable breakdown of their relationship. The tenor of defendant's comments can reasonably be construed as a clarification of his earlier statement to the court at the conflict of interest hearing that he wanted to proceed with defense counsel. He explained that he had agreed to keep his lawyer not because he thought counsel was doing a good job but because he was more worried about who might replace him. Additionally,

74

comments by defense counsel and the court itself indicate they were uncertain of what defendant wanted. Trial counsel characterized his complaint as, at most, "quasi *Marsden*," and the court cleared the courtroom out of "an abundance of caution," presumably in the event defendant did request that counsel be discharged. Even when the court stated it would not "relieve counsel at this point," it prefaced that statement by remarking, "[w]hether or not this is a real *Marsden* type situation or not, is hard to say at this point . . . ."

We have not previously considered whether a defendant with retained counsel may be found to have asserted the right to discharge the attorney without explicitly making such a request. Some touchstones in our decisions are, however, helpful by analogy. The right to discharge retained counsel flows from the Sixth Amendment right to counsel. As we observed in a different context, that right is personal to the defendant. (*People v. Badgett* (1995) 10 Cal.4th 330, 343-344 ["The right to counsel is a personal right [citation], and a violation of that right cannot ordinarily be asserted vicariously."].) Moreover, in the *Marsden* context, we require "at least some clear indication by defendant that he wants a substitute attorney" before the trial court must conduct a hearing on such request. (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8; see *People v. Dickey* (2005) 35 Cal.4th 884, 920 [trial court did not err in declining to conduct *Marsden* hearing at conclusion of guilt phase where "[d]efendant did *not* clearly indicate he wanted substitute counsel appointed for the penalty phase"].)

Defendant contends that, even though he failed to explicitly ask the court to discharge his attorney, the trial court "plainly understood [defendant's] comment as a request to discharge his attorney," as indicated by its statement that counsel would not be relieved. He relies on *People v. Lara* (2001) 86 Cal.App.4th 139 (*Lara*), in support of his argument.

75

In *Lara*, on the day set for trial, defense counsel told the trial court the defendant wished to speak about conflicts between the two of them. When the prosecutor offered to step outside, the court told her to wait, explaining, " 'I am not sure it is a Marsden motion yet.' " (*Lara*, *supra*, 86 Cal.App.4th at p. 146.) Defense counsel replied, " 'I have a feeling that is probably what it is.' " (*Ibid.*) The court cleared the courtroom and invited the defendant to speak. The defendant complained that counsel had not interviewed witnesses and had not spoken to him in the preceding eight months. Counsel responded that they disagreed about calling the defendant's accomplice to the stand. The trial court characterized the dispute between the defendant and counsel as a " 'tactical difference' " (*id.* at p. 148) that did not " 'rise to the level in the type of breakdown in the attorney-client relations that Marsden is looking at' " (*ibid.*) and ruled that it was " 'going to deny your request in the Marsden [*sic*]' " (*ibid.*). When the prosecutor returned, the court stated the defendant's *Marsden* motion had been denied. (*Ibid.*)

On appeal, the defendant asserted the trial court had applied the wrong standard to his request to discharge his attorney, who had been retained rather than appointed. The Attorney General argued that the defendant never requested that his attorney be discharged. The Court of Appeal acknowledged it was "a close question as to whether appellant wanted to discharge [counsel]." (*Lara*, *supra*, 86 Cal.App.4th at p. 157.) It concluded, however, that "the trial court obviously interpreted appellant's complaints as sufficient to raise a *Marsden* motion," and that its evaluation of those complaints strongly implied "that it was willing to grant the supposed *Marsden* motion and discharge [the] attorney if the court found an irreconcilable conflict existed" between the defendant and counsel. (*Id.* at p. 158.) Under these circumstances, the reviewing court "rel[ied] on the [trial] court's factual interpretation of the situation as involving a request by [the

76

defendant] to discharge his defense attorney and obtain a new attorney to represent him." (*Ibid*.) It held that the trial court, by applying the *Marsden* standard to a request to discharge retained counsel, had erred and the error required automatic reversal. (*Lara*, *supra*, at pp. 165-166.)

*Lara* is distinguishable because there, unlike the case before us, the trial court plainly understood the defendant to be bringing a *Marsden* motion to replace counsel. Here, defendant's equivocal statements, combined with the uncertainty expressed by defense counsel and the court as to what he wanted, did not constitute a clear indication he wanted to discharge counsel. Accordingly, the trial court did not erroneously deny a request to discharge counsel because there was no request to be ruled on.

Moreover, unlike *Lara*, the court here did not indicate it was prepared to "grant the supposed *Marsden* motion" (*Lara*, *supra*, 86 Cal.App.4th at p. 158) had it found an irreconcilable conflict existed. Its invocation of *Marsden* principles must be seen in context as an attempt to respond in some manner to defendant's stated concerns about his conflicts with his attorney and not a true *Marsden* ruling, since the court was doubtful it had been presented "with a real Marsden type situation." Had defendant clearly indicated he wanted to discharge his attorney, the trial court could have then assessed whether granting the request would prejudice him or disrupt the orderly process of justice. The court likely would have been well within its discretion to deny such a request on the latter ground, given that it would have come in the midst of defendant's penalty phase case and without any substitute counsel at hand. Accordingly, we conclude that the trial court did not err when it said that counsel would not be relieved.

77

### 3. Exclusion of Evidence of Manner of Execution

During the penalty phase, defendant sought to ask his correctional expert, James Park, about his experience with executions. The prosecutor asked to approach the bench, where defense counsel stated he intended to ask Park about the manner of executions. The court sustained the prosecutor's objection. Defendant contends the ruling was error. It was not.

The parties at the penalty phase of a capital case may introduce evidence "relevant to aggravation, mitigation, and sentence" (§ 190.3), provided that such evidence pertains to the "character or record of the individual offender or the circumstances of his particular offense" (*People v. Grant* (1988) 45 Cal.3d 829, 860). In *Grant*, we rejected the defendant's claim that evidence of the manner of execution was admissible under this statute, explaining: "Unlike mitigating evidence of a defendant's background and character, which may be introduced to elicit the sympathy or pity of the jury, accounts of the executions of others do not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial." (*Ibid.*) We have consistently followed *Grant* on this point. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1124; *People v. Whitt* (1990) 51 Cal.3d 620, 644-645; *People v. Thompson* (1988) 45 Cal.3d 86, 138-139; *People v. Harris* (1981) 28 Cal.3d 935, 962.)

Defendant asks us to reconsider these decisions, arguing that they have been undermined by the United States Supreme Court's decisions in *California v. Ramos* (1983) 463 U.S. 992, 1009 (the federal Constitution permits the state to instruct juries about the Governor's power to commute a sentence of life without parole), *Tennard v. Dretke* (2004) 542 U.S. 274, 284 (under the Eighth Amendment, " ' "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could

reasonably deem to have mitigating value" ' "), and *Smith v. Texas* (2004) 543 U.S 37, 44 (same).  That is incorrect.  As we have since explained, "[I]t is not the law that jurors must be allowed to consider any evidence a defendant offers on the question whether the death penalty is morally appropriate.  Evidence is inadmissible if it does not pertain to a defendant's individual character and record, but pertains solely to the death penalty generally, such as how death is inflicted . . . ." (*People v. Smith* (2005) 35 Cal.4th 334, 366; see also *People v. Collins* (2010) 49 Cal.4th 175, 233.)

### 4. Admission of Testimony About Statements by Defendant's Father

As part of its effort to rebut defense evidence that defendant's father had been abusive, the prosecution called Joseph Collamati, a Massachusetts police officer who had been acquainted with defendant and his father.  The prosecutor asked Collamati if defendant's father had told him about problems with defendant's behavior.  Following a defense objection, the prosecutor explained he was offering the statement under the state of mind exception to the hearsay rule to show the senior O'Malley's state of mind.  The defense countered that his state of mind was not at issue.  The trial court overruled the objection, instructing the jury the evidence was limited to state of mind and "not for the truth of the matter asserted."  Collamati testified that defendant's father had told him defendant was "running wild," using drugs and alcohol, and that the senior O'Malley had no control over him.  Collamati testified further that defendant's behavior upset his father to the point that "a couple of times" he was "almost in tears."

As relevant here, the state of mind exception to the rule against hearsay applies when the out-of-court statement is "offered to prove the declarant's state of mind, emotion, or physical sensation . . . when it is itself an issue in the action." (Evid. Code, § 1250, subd. (a)(1).)  Defendant argues that his father's state of

79

mind was not at issue here, and that the trial court therefore erred in admitting Collamati's testimony. We agree.

Most of Collamati's testimony about the senior O'Malley's statements did not even describe the latter's state of mind; rather, it described defendant's misbehavior. Assuming for the sake of argument that defendant's behavior had some relevance to the question of whether the senior O'Malley abused his son, the jury could have considered it only if it was admitted for its truth, and it was inadmissible for that purpose. As for Collamati's testimony that the senior O'Malley was upset by the misbehavior, it did describe the father's state of mind, and the Attorney General argues it was therefore admissible to rebut defendant's evidence that his father was abusive, apparently based on the theory that such parental concern is inconsistent with the abuse defendant reported. We are not persuaded. Abusive parents are often upset at the misbehavior of their children; indeed, that distress sometimes causes the parent to engage in the abusive conduct. Moreover, defendant described a long pattern of abuse by his father beginning when he was a child and not simply during his teenage years when, in his father's eyes, he began to go astray.

Nonetheless, the erroneous admission of Collamati's testimony was harmless. Evidence that defendant engaged in out-of-control behavior as a teenager and that his father found this behavior distressing was of little importance when compared to the vicious murders he was found to have committed. Thus, it is not reasonably possible that, had it been excluded, the result of the penalty phase would have been altered.

### 5. *Alleged Double Counting of Special Circumstances*

Defendant contends CALJIC No. 8.85, in combination with remarks by the prosecutor in his closing argument, improperly permitted the jury to double count

the financial gain and robbery special circumstances by also considering them as circumstances of the crime. Assuming the claim is not forfeited by defendant's failure to request a clarifying instruction (see *People v. Holt* (1997) 15 Cal.4th 619, 699), the claim is meritless. As defendant acknowledges, we have repeatedly rejected the argument that the instruction inherently encourages such double counting. (*People v. Montes* (2014) 58 Cal.4th 809, 893; *People v. Burney* (2009) 47 Cal.4th 203, 261; *People v. Lewis* (2001) 25 Cal.4th 610, 669; *People v. Ayala* (2000) 24 Cal.4th 243, 288-289.)

Defendant asserts that the prosecutor's argument encouraged double counting even if the trial court's instruction did not. He has forfeited this claim by failing to raise it at trial. Ordinarily, a claim of prosecutorial misconduct is not cognizable on appeal unless the defendant both objects to the misconduct and seeks an admonition from the trial court to the jury regarding the claimed misconduct. (*People v. Gonzalez* (2012) 54 Cal.4th 1234, 1275.) Defendant did neither.

In any event, "the prosecutor did not urge the jury to double count the circumstances of the crime and the special circumstances." (*People v. Montes*, *supra*, 58 Cal.4th at p. 893.) True, he mentioned the facts underlying the special circumstance findings when he discussed the aggravating circumstances of the offense (§ 190.3, factor (a)), and he also asked the jury to consider the special circumstances themselves as circumstances in aggravation. But he did not ask the jury to double count the facts underlying the special circumstances. To the contrary, he reminded the jury that weighing the factors in mitigation and aggravation was "not just a mere mechanical counting up of factors on each side of an imaginary scale," and that it should "assign whatever moral or sympathetic value you deem appropriate" to each factor. "In light of the prosecutor's remarks and the standard instructions given about the weighing of aggravating and mitigating circumstances given in this case, we find no reasonable likelihood the

81

jurors were misled or confused in the manner defendant suggests." (*People v. Lewis*, *supra*, 25 Cal.4th at p. 669.)

### 6. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed six instances of misconduct in his closing argument. The claims are both forfeited and meritless.

" ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." [Citation.] "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." ' " (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 1275.)

Defendant failed to object to any of the statements he now asserts were misconduct, thus forfeiting each claim on appeal.[12] As explained below, the claims are also without merit.

---

[12] Defendant asks us to review his claims of prosecutorial misconduct under the rubric of ineffective of assistance of counsel, asserting there was no tactical reason for defense counsel not to have objected to these statements by the prosecutor. Because we find either no misconduct, or, assuming misconduct, no prejudice, counsel's failure to object was not ineffective assistance, nor was defendant prejudiced by his failure to do so. (See *In re Champion* (2014) 58 Cal.4th 965, 1007-1008 [stating the standard for ineffective assistance of counsel claims].)

Defendant contends the prosecutor committed misconduct by urging the jury to double count certain evidence as both a circumstance of the crime and a special circumstance. We rejected the claim in the previous section.

Defendant contends the prosecutor appealed to the prejudices and passions of the jury by contrasting the murder of defendant's victims with the legal protections defendant had enjoyed during his trial at which his life was at stake. " 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.) But the prosecutor's remarks did not appeal to the jury's passions or prejudice. He made them while addressing a concern that "[i]f it's wrong for the defendant to kill, why should the state have a right to take a life[.]" He argued, "there's a big difference between [the] murders [defendant] perpetrated and imposing the death penalty after a fair trial with the protection of each and every one of the defendant's constitutional rights, as well as after a lengthy and exhaustive consideration by you of which penalty is appropriate." These remarks were designed to assuage any doubt jurors might have that imposing the death penalty was the equivalent of committing murder, not to claim that defendant deserved the death penalty because, in contrast to his victims, he enjoyed the law's procedural protections. Thus understood, the comments were not misconduct.

Nor was it misconduct for the prosecutor to urge the jury that, notwithstanding its right to consider mercy toward defendant, it should show him no more mercy than he showed his victims. (*People v. Collins*, *supra*, 49 Cal.4th at p. 230 ["It is not improper to urge the jury to show the defendant the same level of mercy he showed the victim."].)

83

Defendant contends the prosecutor argued that the jury should reject sympathy and remorse because in the guilt phase defendant denied committing the murders, while in the penalty phase he presented mitigating evidence regarding his upbringing.

A prosecutor may not cite a defendant's claim of innocence as evidence that the defendant lacks remorse. (*People v. Fierro* (1991) 1 Cal.4th 173, 243-244, disapproved on other grounds in *People v. Thomas* (2012) 54 Cal.4th 908 and *Letner and Tobin*, *supra*, 50 Cal.4th 99.) Here, in the course of urging the jury to reject defendant's mitigating evidence that he suffered from fetal alcohol syndrome, the prosecutor argued: "What we have to do during the guilt phase of this trial, what we are dealing with here is blame. We're dealing with the concept of blame. In the guilt phase of the trial [defendant] took the stand and testified for 13 days and whatever, and indicated, 'I didn't do the Sharley Ann German killing,' indicated that Rex Sheffield did the other two. Blame. [¶] Guilt phase, blaming Rex Sheffield. Penalty phase, I submit, blame again, finger of blame on bad father, finger of blame on drinking mother, finger of blame on fetal alcohol syndrome. All right. There's no remorse there. There's no accepting of responsibility for terrible crimes. Not one but three."

As noted, defendant's failure to object to the remark forfeits his claim on appeal. Assuming for the sake of argument that the prosecutor's argument was improper, it "was brief and transitory" and "did not impermissibly characterize defendant's lack of remorse as an aggravating factor." (*People v. Fierro*, *supra*, 1 Cal.4th at p. 244.) Any impropriety was therefore harmless.

Next, defendant contends the prosecutor committed misconduct when he asked the jury to return a death verdict to provide "justice for the victims." In context, the prosecutor argued: "What I am asking you to do is follow the law, consider the evidence, and render a just verdict. What we're asking for is justice,

*justice for the victims*, justice in this case.  [¶]  I submit to you that the appropriate punishment is the death penalty and I hope that after you've reviewed the evidence and the law and applied the moral weight to all of the factors that you will find that sympathy, mercy is not enough in this case to outweigh all of the other factors in aggravation."  (Italics added.)

According to defendant, the italicized portion of the argument was impermissible because it was equivalent to the presentation of evidence that a defendant's victims believe death is the appropriate verdict, which is impermissible.  (*People v. Lancaster* (2007) 41 Cal.4th 50, 97.)  We disagree. "The prosecutor has wide latitude to argue that, based on the evidence presented, the death penalty is the proper punishment commensurate with defendant's crime."  (*People v. McKenzie* (2012) 54 Cal.4th 1302, 1359, disapproved on other grounds in *People v. Scott*, *supra*, 61 Cal.4th 363.)  By asking for "justice for the victims," the prosecutor did not suggest that the victims personally believed the jury should return a death verdict; rather, he simply said that such a verdict would bring them justice.  We see nothing improper in this comment.

Defendant contends the prosecutor improperly appealed to the jury's sense of patriotism when he argued "that a free society requires of its citizens, of its jurors, vigilance, courage, the strength and resolve in making the hard decisions that you're going to have to make."  Contrary to defendant's argument, nothing in these remarks reminding the jurors of their weighty responsibility equated being a good citizen with returning a verdict of death in this case.  The claim is, in any event, unavailing.  (See *People v. Brady* (2010) 50 Cal.4th 547, 584 [prosecutor's argument that " '[t]his is a case where society cries out for the death penalty' " and the jurors were " 'the conscience of society' " was not improper]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1246 [prosecutor's argument that jurors were " 'protectors of society from enemies within' " was not improper].)

85

Finally, defendant contends the prosecutor committed misconduct by arguing the jury could not consider any lingering doubt as to defendant's guilt in determining penalty when he told the jury: "You don't need to worry about executing an innocent man." Once again, placed in context, the remark belies the meaning defendant ascribes to it. The prosecutor was addressing a concern raised by some jurors during voir dire that they would not want to impose the death penalty "unless [they] knew the person was truly guilty." The prosecutor then noted, correctly, that "Your guilty verdict showed that the evidence convinced you beyond a reasonable doubt and to a moral certainty that the defendant . . . is guilty of these crimes. He is not innocent at this point. You don't need to worry about executing an innocent man." Thus understood, there was nothing improper in the remark, which was no more than a reasonable commentary on the state of the evidence regarding defendant's guilt, and not a description of the legally permissible mitigating factors.

### 7. Constitutional Challenges to California's Death Penalty Scheme

To preserve them for future review, defendant briefly raises a number of constitutional challenges to California's death penalty scheme which, he acknowledges, we have previously and consistently rejected. We do so again, concluding as follows:

(1) The use of defendant's age as a sentencing factor (§ 190.3, factor (i)) is not impermissibly vague under the Eighth Amendment. (*People v. Ray* (1996) 13 Cal.4th 313, 358.)

(2) "The homicide and death penalty statutes adequately narrow the class of first degree murderers eligible for the death penalty. The statutory scheme is not overbroad or arbitrary in this regard." (*People v. Contreras*, *supra*, 58 Cal.4th at p. 172.)

86

(3)  "Section 190.3, factor (a) (the circumstances of the capital crime) is not so broad as to be applied in a wanton or freakish manner.  [Citation.]  Nor is factor (b) of the same statute (the defendant's other violent criminal activity) irrational or invalid insofar as it permits consideration of unadjudicated crimes."  (*People v. Contreras*, *supra*, 58 Cal.4th at p. 172.)  "In particular, the jury need not make a unanimous finding under section 190.3, factor (b) . . . ."  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068.)  Nor were defendant's constitutional rights violated by the use of the same jury that convicted him of first degree murder to evaluate the evidence of prior unadjudicated crimes.  (*People v. Hawthorne* (1992) 4 Cal.4th 43, 76-77, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610.)

(4)  The trial court did not violate defendant's constitutional rights by failing to instruct the jury it must unanimously agree he committed the 1979 assault — introduced as a prior felony conviction under section 190.3, factor (c) — notwithstanding the United States Supreme Court's decision in *Ring v. Arizona* (2002) 536 U.S. 584.  (See *People v. Schmeck* (2005) 37 Cal.4th 240, 304, overruled on other grounds in *People v. McKinnon*, *supra*, 52 Cal.4th 610.)  Consideration by the jury of defendant's prior conviction did not place him twice in jeopardy for the same offense.  (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 134-135, judg. vacated on other grounds and cause remanded *sub nom Bacigalupo v. California* (1992) 506 U.S. 802, reaffd. (1998) 6 Cal.4th 457.)

(5)  "Neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires that jurors in a capital case be instructed that they must find beyond a reasonable doubt that . . . aggravating circumstances outweigh mitigating circumstances . . . .  Indeed, trial courts 'should not instruct the jury regarding any burden of proof or persuasion at the penalty phase.'  [Citation.]  ' "Unlike the guilt determination,

87

'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." ' [Citations.]" (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1215-1216.)

(6) Instructions in the language of CALJIC No. 8.85 (given here) do not "violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors, delineate between aggravating and mitigating circumstances, or specify a burden of proof either as to aggravation (except for other crimes evidence) or the penalty decision." (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 305.) "Use in the sentencing factors of such adjectives as 'extreme' . . . and 'substantial' . . . does not create an improper barrier to consideration of mitigating evidence." (*People v. Contreras*, *supra*, 58 Cal.4th at p. 173.)

(7) "We have also repeatedly rejected defendant's claim that the death penalty statute violates international norms in general or, specifically, the International Covenant on Civil and Political Rights. [Citations.] Because defendant fails to explain why our precedents on this issue should no longer be followed, we reject this claim as well." (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 881.)

### E. New Trial Motion

Defendant contends the trial court erred under state law in denying his motion for new trial (Pen. Code, § 1181) and that the denial also violated the due process clause of the Fourteenth Amendment to the federal Constitution and his Eighth Amendment right to a reliable guilt phase proceeding. We reject the claim.

#### 1. Background

As previously explained, the defense to the Sharley Ann German murder was that defendant was in Massachusetts on April 25, 1986, the day she was killed. Not only did defendant and Karen Dolan testify to this effect, he called

88

three friends from Massachusetts (Robert Thompson, Mark Weber, and Karen Shaw), all of whom testified they saw defendant in Massachusetts at the end of April 1986. Weber testified that defendant stayed overnight at his house the last weekend of April, while Thompson testified he gave defendant a ride to Logan Airport in Boston that weekend. Glenn Johnson testified he picked up defendant from the San Francisco airport three or four weeks before Johnson's birthday, which falls on May 27.

The prosecutor sought through cross-examination to create doubt about the accuracy of the defense witnesses' memories of when they saw defendant in April, and presented rebuttal evidence designed to undermine their testimony. After establishing defendant's pattern of charging long distance calls he made while on the East Coast to his San Jose telephone number, the prosecution presented evidence that there were no such charges after April 10, 1986, 15 days before Sharley Ann was murdered. Karen O'Neal, who had been married to defendant's friend John Mercuri, testified that defendant threatened to kill her and members of her family if she laid claim to any marital assets during the divorce proceedings. She testified she called him in California on April 14, 1986, and told him she would sign over everything to Mercuri. Her phone records were introduced to show the call was made on that date.

Defendant brought a posttrial motion for new trial based on newly discovered evidence relating to the killing of Sharley Ann. (§ 1181, subd. (8).) Included in the motion was an affidavit by one Louis Lombardi, a friend of defendant's. According to the motion, Lombardi had been prepared to testify that he and defendant were supposed to go to a San Francisco Giants baseball game on April 29, 1986, but defendant was out of town on that date. Just before trial, Lombardi told defense counsel he was no longer sure of the date and believed that defendant had been with him at the game. The defense then decided against

89

calling him to testify. After trial, Lombardi recanted his statement that defendant was with him at the baseball game, stating he lied because he had not wanted to testify.

At the hearing on the new trial motion, defense counsel represented that the defense had located a second witness, Richard Lillis, defendant's high school hockey coach, who was prepared to testify he saw defendant at a restaurant in Massachusetts on April 20, 1986, which was Lillis's birthday. (Lillis did not submit a declaration in support of the motion.) Finally, defense counsel represented that his investigator had uncovered evidence that tended to impeach Karen O'Neal's testimony that she called defendant on April 14 and agreed not to seek any of the marital assets in her divorce with John Mercuri. Counsel stated that on April 19, O'Neal submitted a statement of assets and liabilities in the divorce proceeding. He commented that it "would seem strange if she was threatened on [April] 14th, she wanted to settle the case, she was setting forth all her assets in litigation posed just some days later."

The trial court denied the motion. The court found "the evidence overwhelming that at the time of the Sharley Ann German murder the defendant was not back east. The credibility of Mr. Lombardi is extremely questionable based on him changing his stories. The court does not find this to be newly discovered evidence, just an affirmation of one of Mr. Lombardi's versions of what his testimony may have been." The court was skeptical that the other evidence — presumably Lillis's proposed testimony and the purported impeachment evidence relating to O'Neal's testimony — constituted newly discovered evidence for purposes of the statute. That aside, it concluded: "It's extremely doubtful whether or not that [evidence] would have in any way made any difference in the eventual verdict. If they had testified, or Mr. Lombardi had testified, in accordance with the affidavits, then, everything considered, no

90

different result would have taken place, especially in light of the other evidence that was presented, especially the phone records."

### 2. *Discussion*

" 'To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial.' [Citation.] '[T]he trial court has broad discretion in ruling on a new trial motion . . . ,' and its 'ruling will be disturbed only for clear abuse of that discretion.' [Citation.] In addition, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*Verdugo*, *supra*, 50 Cal.4th at p. 308.)

" 'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: " '1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.' " ' " (*People v. Howard* (2010) 51 Cal.4th 15, 43.) Here, the trial court did not abuse its discretion when, applying these factors, it denied defendant's new trial motion.

We defer to the trial court's finding that, based on his affidavit, Lombardi would not have been a credible witness. Not only had he twice changed his story of whether defendant had or had not accompanied him to a baseball game but, as the prosecutor observed at the hearing, he also would have been subject to impeachment by his failure to have testified about the baseball game at the preliminary hearing.

91

The defense's description of Lillis's proposed testimony was based entirely upon defense counsel's representation of what he would say, not on a declaration by Lillis himself. This, surely, is not the " ' " 'best evidence of which the case admits.' " ' " (*People v. Howard*, *supra*, 51 Cal.4th at p. 43.) In any event, Lillis's testimony would have been, at most, cumulative to the testimony of Thompson, Weber, and Shaw, all of whom claimed to have seen and been with defendant in Massachusetts at the end of April 1986. Defendant appears to be arguing that, unlike their testimony, Lillis's would have been unassailable because the date he remembered seeing defendant was his birthday. But any testimony involving a witness's memory of events that occurred years earlier is susceptible to impeachment. Lillis would have been no different on that score than defendant's other alibi witnesses who, after all, testified not just that they had casually seen him but that he had visited with them and even stayed at the home of one of them.

Finally, we agree with the trial court that the evidence that would purportedly have impeached Karen O'Neal's testimony hardly seems so significant that it would have made a different result probable on retrial, particularly in light of the telephone records showing that defendant did not charge any long distance calls to his San Jose telephone number within two weeks of Sharley Ann's murder. Accordingly, we find no abuse of discretion in the trial court's denial of defendant's new trial motion.

### F. Cumulative Error

Defendant contends the cumulative effect of prejudice flowing from his allegations of error requires reversal. As to most of his allegations, we have concluded there was no error. In those instances in which we found or assumed error occurred, we have concluded any error was not prejudicial. Even when

92

considered altogether, those actual or assumed errors did not deprive defendant of a fair trial.

## CONCLUSION

The judgment is affirmed.


**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. O'Malley

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S024046
**Date Filed:** February 18, 2016

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Hugh F. Mullin III


_____

**Counsel:**

Cliff Gardner, under appointment by the Supreme Court, and Lazuli Whitt for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler and Ronald A. Matthias, Assistant Attorneys General, Glenn R. Pruden and Nanette Winaker, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
Law Office of Cliff Gardner
1448 San Pablo Avenue
Berkeley, CA 94702
(510) 524-1093

Nanette Winaker
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5934